Etta Belle McNeill, Appellant, v. Louisa I. McNeill, et al., Appellee.

Bastards: inheritance: recognition: evidence.  To establish the paternity of an illegitimate child on the ground of general recognition and thus entitle it to inherit the evidence of recognition must be clear and convincing; and if not in writing it must have been generally and commonly known and understood among a majority of those who would be likely to know and have occasion to refer to the matter.  This is especially true where it is sought to establish paternity after the death of the father.  In the instant case the evidence is held insufficient to establish general and notorious recognition of plaintiff by decedent as his child.                    /

*Appeal from Monona District Court.*—Hon. Lawrence De Graff, Judge.

Wednesday, September 30, 1914.

This is an action in equity for partition of certain real estate, six hundred and forty acres in Monona county, Iowa, of the value of about $50,000.  It is the claim of plaintiff that she is an illegitimate child of Edwin R. McNeill, deceased, and that she was generally and notoriously recognized by him as such.  Defendants are the widow and children of said deceased, who deny that plaintiff is entitled to an interest in the property.  The trial court found for the defendants and dismissed the petition of plaintiff.  She appeals.—*Affirmed.*

*Shull, Sammis & Stilwell,* for appellant.

*J. W. Anderson,* for appellees.

Preston, J.—The issue is one almost entirely of fact whether Edwin R. McNeill was the father of plaintiff, and

whether he recognized her as such, and, if so, whether the recognition was general and notorious, as provided in section 3385 of the Code.   There is no claim that there was recognition in writing.

There were sixteen witnesses for plaintiff and sixty-one for the defendants.   Manifestly it would not be practicable to detail all or any considerable part of the evidence contained in the large record.   We have examined the record carefully and scrutinized closely all the circumstances shown in the record, as it is our duty to do in such a case.   There is much hearsay evidence in the record in the evidence of both plaintiff and defendants, as to rumors, reports, and the like, as to the relations of different parties with others, but it all went in without objection.

Edwin R. McNeill died intestate in October, 1907.   He left surviving a widow and seven children who were born to him and his wife after marriage.   For convenience, we may in the opinion refer to Edwin R. McNeill, at least a part of the time, as the deceased.

The record discloses, without any substantial dispute in the evidence, that plaintiff is an unmarried woman now about forty-six years of age.   She is the daughter of one Adeline McClintock, then an unmarried woman, and was born in Lower Turkey Foot township, Somerset county, Pa., February 4, 1868, at the home of James McNeill; the latter being an older brother of deceased, Edwin R. McNeill.   Plaintiff came to Iowa when about eight years of age, and resides with an unmarried uncle, Marcellus McClintock, on a farm a few miles from Le Mars, Iowa.   For nearly forty years, or since coming to Iowa, she has resided within a distance of fifty or sixty miles from the home of deceased, Edwin R. McNeill, who resided near Onawa, in Monona county, Iowa.   For about a year she lived with Neal McNeill, a brother of deceased, and about four or five miles from the home of Edwin.

Deceased came to Iowa about July 1, 1868, from Somerset county, Pa.   This was about two months after his marriage

to the lady who is now his widow, and was about five months after the birth of plaintiff. The lady he so married resided in Somerset county, and they were married within a few miles of the home of Adeline. Deceased was younger than Adeline; she was twenty-nine years old at the date of the birth of plaintiff, and lived with her father and some of her brothers on the side of a mountain not far from the home of James McNeill. While Adeline and Edwin were cousins, the record shows that the families were not of the same set or class; her father and some of her brothers are shown to have been rough, drinking, fighting people. The families lived several miles apart. Deceased had been away in the far West for some time and until about a year before plaintiff was born. Some of the witnesses for plaintiff, and others for defendants, testified that the mother, Adeline, was a woman of loose morals and bad character prior to the. birth of plaintiff. Some of the witnesses say she was good looking and sporty. There is evidence tending to show that it was common report that she was maintaining illicit relations with different young men of the neighborhood, and also with her own father; that plaintiff was a home child. It is shown that at about that time Edwin kept a horse and buggy, or sleigh, and went with the girls, and, while some of them say he was inclined to be sporty, they testify that he was a young man of good character. There is no word from any witness that he ever kept company with or waited upon Adeline, the mother of plaintiff. Adeline was married, after plaintiff was born, to one Barron or Barnes; some of the witnesses say his name was Barron, and others say Barnes. She died in 1897. All of her brothers had moved to Northwestern Iowa prior to her coming, and her father and mother had died several years before. The brothers lived in Monona, Plymouth, and Lyon counties.

Somerset county, Pa., is a rough mountainous district. It had no railways at the time plaintiff was born, and was sparsely settled.

We shall refer to the evidence of plaintiff somewhat in detail, and some of the circumstances tending to discredit it, after which we shall refer in a general way to the evidence introduced on behalf of the defendants. It will be observed, at the outset, that substantially all the evidence for plaintiff comes from close relatives of her mother, the McClintocks, except James McNeill, a brother of deceased, and Ella Draney, a daughter of James, and one or two others.

Ella Draney testifies that plaintiff was born at the home of James McNeill and wife; that Adeline McClintock stated, soon after plaintiff was born, that Edwin R. McNeill was the father; that such statements were put in the form of an affidavit or information in bastardy proceedings, charging deceased with being the father; that one Hanna, a justice of the peace, was present when the same was made; and that it was drawn at her father's house. The witness was a thirteen year old girl at that time. Hanna is dead. The affidavit or information was not produced; no record of such a proceeding has been found; no bond or record of the giving of a bond, as the law of Pennsylvania then required, has been shown. The mere fact that such an information was filed, if it was filed, is not proof that deceased was guilty. The witness came to Iowa thirty-eight years ago and lived a part of the time in Monona county, two miles from the home of deceased. Plaintiff and her mother then lived about three miles from him. She says she never had any conversation with Edwin with reference to the paternity of plaintiff, and that deceased never visited at the home of her father, James McNeill, after plaintiff was born and before deceased came to Iowa.

James McNeill, a brother of Edwin, came to Monona county, Iowa, in 1872. He lived there twenty-seven years, and then moved to Macy, Nebraska, twelve years ago. He testifies that his daughter, Mrs. Draney, was living at his home when plaintiff was born; that deceased was about there at that time; that the evening before plaintiff was born

deceased asked him how Adeline was; that deceased came back after plaintiff was born to see how they were getting along, and went into the room and stayed until he got tired and came out and went home; that deceased said they were getting along all right, and that he was the father of the child; that he heard deceased say that frequently; that he worked for deceased a year after coming to Iowa, and that they talked about it in Iowa; that after the birth of plaintiff, and before deceased came to Iowa, he (deceased) came nearly every Sunday and talked about plaintiff and her mother and said he would like to have the girl at home; that deceased came there and made an arrangement with the wife of the witness, under which Adeline came to their home to give birth to her child; said he guessed he was the father of the child. He testifies to the making of an affidavit or information; but he does not think she signed any papers. Deceased was not present when the affidavit was made; does not know of any proceedings in court about the matter; that there was a settlement between Adeline and deceased about a month after plaintiff was born; that he thinks Edwin told him that he had paid, or was to pay, $300; gave notes; that it was the general talk in the community at that time that deceased was the father of plaintiff; that he talked with deceased about it often, but does not know that deceased spoke of it in the presence of others; that, after he came to Iowa, deceased often talked to him about plaintiff and her mother and wished he had them out here so that he could help them; that all the time he said plaintiff was his child; that, after plaintiff and her mother left Monona county, deceased wanted him to go and see if he could not get plaintiff to come to live with the deceased. Witness made an excuse for not doing so. He testifies that this was when plaintiff was eight or nine years old, which would be about the time she came to Iowa. He says he did not see her thereafter until after the death of Edwin, when she came to Nebraska to see him, with her uncles, Marcellus and Chauncey; that these parties had been to see

him twice and were present when his deposition was being taken; that he never heard deceased tell any one else that he was the father of plaintiff; that he heard deceased tell Tressler, who is now dead, in a joking way, that he was the father of the child, and that this was the first year he came to Iowa; that a few days or a few weeks before Edwin died he said that he wished he had the girl at home, but that he never said he had tried to get her or that he had sent her money; that "I think the settlement that was made after the birth of Etta was made down at Squire Hanna's, but don't know anything about it except what I heard Hanna tell me afterwards that they settled it at his place."

Such is the substance of the twenty printed pages of the testimony of this witness. We shall refer to some of the circumstances tending to materially weaken his evidence. Verbal admissions and statements are often weak. Some of the more important admissions and statements testified to by this witness occurred more than forty years ago. The witness was eighty years of age at the time he gave his testimony. Physically he was feeble, and his mind and memory were somewhat impaired. He died before the case was submitted. It is unnatural for a brother to testify freely, as this witness did, against another brother, unless there is some motive for so doing. On the stand this witness disclaims any feeling against deceased, and says he was as friendly as he ever was, but this may well be doubted, and it is beyond question deceased was bitter against his brother James, so that it is improbable the deceased would make a confidant of James in the later years, as is claimed by James. It is undisputed that Edwin signed a note with James for about $4,000 soon before James moved to Nebraska, some twelve or fifteen years ago. Edwin claimed he signed the note as surety, but this was denied by James. Edwin paid the note and later obtained judgment against his brother. Later, by attachment proceedings, Edwin collected about $900 on this judgment, and this took the entire share of James in the estate of a deceased sister. Edwin charged

that James acted dishonestly in this matter. A brother, Neal, died before James or Edwin. Both attended the funeral of Neal, but they did not speak to each other. James did not attend Edwin's funeral. The witness strikes at the widow and children of Edwin by saying that Edwin's first child was born six months after his marriage; that he heard of this through a letter from the East. The widow says she had a miscarriage. The witness admits, on cross-examination, that he may have told two of the sons of Edwin that he did not know much about the matter. These two sons are defendants, and interested, of course, but they testify that this witness told them on one occasion, and repeated it on another, that he did not know of his own knowledge that the child had been sworn on Edwin; that he did not know whether any affidavits were made, or papers signed; that he never heard Edwin say he had a child in Pennsylvania; that he never heard any one else say to him that deceased had a child in Pennsylvania. James is contradicted by his daughter, Mrs. Draney, the witness for plaintiff, who testifies that she was living at home with her father where plaintiff was born, and that Edwin never visited her father's home after plaintiff was born and before he moved to Iowa. It is claimed by this witness, James, and he so testifies, that deceased expressed himself as anxious to have plaintiff and her mother with him in order to help them; that deceased requested him to see plaintiff and see if he could not get her to live with him. The idea is that deceased, while raising a family of his own, wanted his illegitimate child to come into the home. Further than this, there is no evidence that deceased ever helped her in any way; never gave her any money or presents. Plaintiff admits as a witness that in all the thirty-eight or forty years she and deceased lived in Iowa, and a part of the time in the immediate neighborhood, deceased never came to see her but once, and never spoke to her but once. This was in 1895, and will be referred to later. It may be that the usual tendency, under such circumstances, where pecuniary liability

is involved, would be for deceased to be secretive in regard to the parentage.   Conceding this to be true, it does not avoid the requirement of the statute that the recognition must be general and notorious.   The McClintocks say deceased talked freely about the matter.   Witnesses for defendants say that deceased was of an open, genial, social disposition, and that there was nothing secretive in his make-up.   Many of his closest neighbors and friends, social and business associates in Iowa for over forty years, and a large number of the older residents of Pennsylvania where plaintiff was born, and who have lived there ever since, testify that they never heard him or any one else mention the matter of his alleged paternity, but this will be referred to later.   It appears that Neal Mc-Neill, a brother of deceased, sent the money with which plaintiff and her mother came West; that they worked on Neal's farm for a time after coming to Iowa; that Neal visited them every year until plaintiff was twenty-one and gave them money and presents.   Neal's relatives say they know no reason for his having done so.

There are other circumstances in the record bearing upon the weight of the testimony of the witness James McNeill.   We have digressed a little, perhaps, and now return to the evidence for plaintiff.

B. F. Clevenger, of Somerset county, Pa., who had lived there all his life, testifies that about the time plaintiff was born he heard that Edwin was her father; that it was talked of through the neighborhood for a while, but soon died away; that he had a conversation with deceased, shortly before the child was born, in his bedroom; that the two were in bed by themselves.   He further testifies:

It was reported that he was trying to get the girl to put it on me, and I thought it was a good thing to talk it over, and he said, 'And who told you?' and I told him that the girl had.   I worked where the girl was and found it out and asked her, and I didn't want to raise a rumpus.   When I asked Ed, he said, 'I might have been deviling her.'   He said, 'She

swore it onto me, and I settled and paid for it, and I have to daddy it.' That is all he said, and is about all that I know. At the time I talked with her, she did not say whose child it was, but said, 'You don't need to fear; you didn't keep company with me.' She said nothing else, and I didn't tell her who told me. She didn't say whose child she was going to say it was. Q. You were not worrying about her placing the child on you, were you? A. I didn't know. Q. You knew you were not in it? A. I knew it, but didn't know what she might do. Q. You thought if she said that was your child it would make you liable? A. I didn't know what was her idea. Q. You knew that you had not been around there? A. No. She worked at the places I told you that I did, and I thought she might put it on somebody else. It wasn't generally known in the neighborhood at the time she was in a family way and before the child was born as to who the father of the child would be, and I never did know whose it was until she swore it on Ed McNeill. When I was talking to Ed McNeill in bed, I already knew from Mitchell McClintock that he had settled for the child. I wanted to find out whether it was so.

Witnesses who lived in the same neighborhood as this witness, and who are disinterested and apparently of good standing, testify that his reputation for truth and veracity is bad. No witnesses were called to sustain him. He appears to have been fearful that Adeline would charge him with the paternity of the child.

Mrs. Jane Tressler, of Somerset county, a cousin of deceased, also a cousin of Adeline, seventy-six years of age, testified:

The little girl went by the name of McNeill; don't remember her first name. I heard her mother a good many times curse her and call her a damned little black McNeill. I often laughed and plagued Edwin McNeill about this child, and he always joked it off. He never denied, or said it was his, and never admitted that it was his child. Of course he was a cousin of mine, and I talked pretty freely to him many a time. I asked him when he saw his daughter last, and I would say Adeline's little daughter, and he would say, 'That had passed over.' He would not say that he had seen her or

anything. He would say that had passed over and joke. Others would be around in the house when I would plague him, and where they could hear, but they did not take any interest in our talk. We were all in the same room, and sometimes they would laugh. This was what we were joking about. I was not present at any time when the matter of settling for the child was brought up. The only thing I heard her say was one day when she was mad, and she said she was going to make it hot for the son of a bitch, and she went to Harnedsville, and Mr. Aleck Hanna was Squire there. That was when the child was pretty good sized. When she used that name she referred to Ed. It was Ed she was mad at. Adeline was a very wicked spoken woman. How hot she made it for Ed I don't know. I did say to Ed McNeill, Jr., and Jim Hanna a couple of months ago that plaintiff was Neal McNeill's child, but I misnamed the person. When Mr. Sammis told me that Etta Belle had written and said that Edwin was the father, I remembered it.

Andrew McClintock, a brother of plaintiff's mother, came from Pennsylvania to Plymouth county, Iowa, thirty-six years ago; resided one year in Onawa, near deceased; testifies to the transaction in 1895 at his home and the home of his brother Marcellus; that when plaintiff and her mother came to Iowa they went to living in one of Neal McNeill's houses, which was a few miles from the residence of Edwin, near Onawa; never heard any of the neighbors in the community around Onawa speak of the fatherhood of plaintiff; never heard it mentioned. Neal McNeill told him he sent the money to bring the plaintiff and her mother West.

Marcellus McClintock testified:. That he has lived three miles west of Le Mars, in Plymouth county, Iowa, thirty-eight years. He is a brother of plaintiff's mother. That he saw deceased twice in Pennsylvania before they left and twice in Iowa. That before he left Pennsylvania it was general talk in the neighborhood that Edwin was the father of plaintiff. He testifies in regard to the transaction in 1895, when it is claimed deceased came to the home of Marcellus and told plaintiff he was her father. This witness so testified. Two

sons of Edwin testified that in investigating the case they went to see this witness, and, in speaking of this transaction, the witness told them that when deceased came there he asked for Chauncey McClintock; "that Adeline and Etta Belle were in the house, and he (deceased) never asked about them or spoke to them;" that Marcellus also said:

Edwin McNeill never treated the girl right, had never given her a dollar or anything in his life; that Neal had always done right by the girl; that he had given her money and presents, but Ed never has and never did; that Edwin had never told him or said anything to them about this being his girl.

Marcellus and brother deny that Marcellus said to these witnesses that deceased did not inquire about plaintiff and her mother, and that he did not speak to them. The witness Marcellus McClintock is shown to have taken a great interest in the matter. Soon after the death of Edwin he examined the records to see if deceased had made a will, employed and paid for the services of an attorney to go to Pennsylvania to investigate the matter and go to Nebraska to see James. Marcellus visited James McNeill in Nebraska several times, and took plaintiff and some of his brothers there, and they were there present when the deposition of James was taken. Marcellus is an unmarried man. He was living at home with his father while Adeline McClintock was living there and keeping house for her father, until she went to James McNeill's a short time before the birth of plaintiff. After coming West Adeline and plaintiff lived with him twenty-four years he says. Adeline kept house for him until she died, and since then plaintiff has kept house for him and was doing so up to the time of the trial. Marcellus deeded eighty acres of land to plaintiff. He gives the date of plaintiff's birth exactly, but does not know his own birthday.

Chauncey McClintock, a witness for plaintiff, testifies that he is a brother of Adeline, Marcellus, and Andrew Mc-

Clintock; that he knew deceased in Pennsylvania a year before he moved to Iowa and worked for him one winter after coming to Onawa, Iowa; never had any talk with him with reference to who plaintiff's father was before deceased was at Andrew McClintock's place in 1895; that he knew Edwin, and knows it was he who was at Andrew's place; that deceased stayed over night at Andrew's at this time in 1895, and in the morning deceased and Andrew went away together; that Adeline was there, but he did not see deceased speak to her. The claim is that deceased and Andrew went to the home of Marcellus in the morning and there saw plaintiff. Witness testifies that he and deceased slept together at Andrew McClintock's the night deceased stayed there, and that deceased asked him where Etta Belle, his girl, was, called her his child, and says that is the only time he ever spoke about it; that at that time witness and deceased were in a room by themselves. Deceased did not say why he came there, and the witness did not know. Witness worked for Neal seven years. He testifies that the reason he did not talk to deceased about plaintiff during the seven years he worked for Neal, and while he worked for deceased, was because he was too mad to mention it, but he says he was not mad in 1895 when deceased stayed at Andrew's; that deceased never spoke of it at any other time, and deceased had not been there since 1895.

Maggie McClintock, a daughter of Andrew, testifies that she had always lived at home in Plymouth county with her father; that Adeline, the mother of plaintiff, was at her father's home about the 1st of September, 1895, and deceased came there; that he remained over night, and left with her father the next morning; that deceased met Adeline that morning before he left, and they talked at the gate; that she did not hear the conversation, but that she and Adeline looked at him when they started away; never saw deceased before or after that.

M. V. B. McClintock, a brother of Adeline, testifies that he lived in Iowa thirty-one years, and has lived in Nebraska

the last fourteen years; that he went back to Pennsylvania from Iowa in the spring of 1868, the year plaintiff was born; that back there deceased told him plaintiff was his child, and that he was going to pay her some money.

We didn't have no talk back there, only I knew how he told me. He said, 'Did you hear that Adeline had an heir?' and I said, 'Yes.' I says, 'Do you know whose it is?' He says, 'Yes, it's mine; I am going up to pay her some money.' Before he left and went to Iowa I think we talked a lot, but I couldn't tell exactly. I wouldn't swear where it was, or how, but every time we would be together we would be talking, you know. He would nearly always mention this, and would ask me how they were getting along. I knew it was generally known and understood in the town and community there who Etta Belle McNeill's father was. Ed told me that he gave her at that time $300. It was before Edwin McNeill came out from Pennsylvania that he told me that he gave $300 to Adeline McClintock.

He testifies further that in 1869, after he came to Iowa, he had a talk with deceased; that deceased asked how Adeline and the baby were getting along. He wanted to get her out here; said he would like to get Etta Belle out here to go to school; that this was in the presence of his brother Neal. He also testifies, that:

Deceased told me in his wife's presence in 1869 that if I would take her back on a visit he would furnish the money; that it wouldn't cost me anything, and that Adeline could come out with me; that he would pay the bill. If I had stayed until fall I would have gone back with his wife, but I went out West. We were alone when I had the two conversations back in Pennsylvania that I have told about, and the other one in Onawa was in the presence of his brother Neal, who is now dead. These were the only conversations that I had with him about the fatherhood of Etta Belle. It has been about forty years since I have saw him to speak to him. He told me he would give me money to bring Adeline back with me right before Mrs. McNeill.

Plaintiff was but one year old at the time this witness claims deceased was wanting her to come to Iowa to go to school. The widow denies the alleged conversation in her presence. Three sons and a daughter of Neal McNeill testify for defendants that they.never heard of any claim that plaintiff was the child of deceased. They lived with their father, a few miles from Edwin, all their lives.

Stephen McClintock, a resident all his life of Somerset county, Pa., testifies that he is a cousin of Marcellus, Andrew, and Adeline; was fifteen years old when plaintiff was born; remembers by hearsay only of Adeline giving birth to a child before she was married; taught school in 1876; a daughter of Adeline attended his school; says she was known by the name of Etta Belle McNeill on his records. He produced two sheets of paper which he testified are the original sheets from which he made his reports. They contain the names of his pupils. Upon these appear the name he says is the one he referred to, and upon these sheets the name is spelled ''Ettabelle McNeal.'' The name appearing in Adeline's Bible is spelled ''Etta Belle McNeal.'' This, with the date of her birth and the names and birth of two other children of Adeline, since deceased, were written by the husband of Adeline after they came to Iowa, some nine or ten years, or more, after plaintiff was born. This witness admits that he told Mr. Rosebery and a son of deceased:

That I did not remember anything about Etta Belle, or who her father was, but I received a letter from her, Etta Belle, after that, that refreshed my memory.

This letter follows:

Le Mars, June 8, 1911.

Mr. Stephen McClintock, Harnedsville, Pa.—Dear Sir: I take the liberty of writing you a letter and beg of you to answer these questions that I may ask as they are of great importance to me. I am Adeline McClintock's child; my name is Etta Belle McNeill, and what I want to ask of you is

do you remember of me going to school to you when you taught in the schoolhouse by our Uncle Andy's and Uncle Mitch's place. I was about seven or eight years old, and if you do what name did I go by in school, was it not registered Etta McNeill and whom did you always hear was my father? Wasn't it Edwin McNeill? I have been told that you remember the occurrence of my birth well, and will you please write me what you know about it. It will help me ever so much in my case. I am trying to prove my heirship and I need all the proof I can get, and I hope you will do what you can for me. My mother is dead, has been dead for fourteen years. I have seen your brother David and he has been here to see us all. I must close as it is soon mail time. Have you seen Edwin McNeill, Junior? He is back there trying to find what he can in regard to the case. They are putting up a pretty hard fight. I hope you will not think that I am intruding on you in any way, and will do what you can for me.

I remain yours truly,  ETTA McNEILL,
Le Mars, Iowa.

P. S. Ans. soon as you get this letter. E. M.

In regard to this letter he says:

That letter was a surprise on me, and it put me to studying, and I wondered if it was possible that I was so far mistaken, and I looked up a school record that I had to see whether this lady was right, and I found she was. I found a record that showed that a girl of that name had come to school to me. This record was a sort of a paper that I blocked off rough in lines to keep my record in the schoolroom as to the attendance and names of the scholars that came to me.

Jonas McClintock, of Pennsylvania, a cousin of Adeline, testifies that he remembers of a child being born to her; that the child went by the name of McNeill.

I hain't sure, but think it was Etta Belle. It was reported that Edwin McNeill was her father. If anything came up and it was talked about, it seemed to be accused as his. It was mentioned so frequently that the fact became firmly fixed in my mind, that that was the general belief and report at that time. I knew Edwin McNeill and his brothers, James and Neal, I had no conversation with Edwin about it. I

heard this talked once or twice anyhow that I remember of about the time of the birth of the child and afterwards.

Mrs. Abi Smith, of Pennsylvania, a cousin of Adeline, testifies that she went to school to Stephen McClintock with Adeline's child, who went by the name of Etta Belle McNeill. "I heard my father, Mitchell McClintock, say that Edwin McNeill was her father." Though this witness was but one year old at the time, she says:

Adeline McClintock was my first cousin. I remember her when I was a child, and remember the circumstances of her having a girl baby. I remember of hearing that she was Edwin's girl before I saw her and when she was a small baby. I can't remember back to the time she was born, because we were so near one age.

Jonas Romesberg, of Pennsylvania, eighty-three years old, testifies that it was the general report throughout the neighborhood that Edwin McNeill was the father of Adeline's child; says he and Edwin were "buddies" and lived close together, but does not know whether deceased kept company with Adeline; testifies that Edwin had a good reputation and was a fine young man. He testified further:

It was said the child appeared to belong to Edwin McNeill, and I suppose that report came from the McClintocks; it was in our neighborhood there. I was well acquainted with the McNeills, and they never said a word to me about it, and I never asked them about it. Some of them said Adeline was kind of a loose character. For my part, I didn't know anything about it. Most of the reports I heard were before Edwin McNeill left for Iowa, not very long before. He left pretty soon after this happened. There wasn't a great deal said. I just wondered one day to a certain friend of mine who the child belonged to, and he said, 'Ed McNeill.' I heard Ed McNeill had to settle for it; that is all I know about it, and practically all I ever knew about it until lately.

C. H. Ankene, of Pennsylvania, testifies:

That he knew Edwin in Pennsylvania; always heard Edwin was the father of Adeline's child. There wasn't much

said about it where I lived. A man told me recently that Neal McNeill was her father, and that she was born during the fore part of the Civil War, but I know he was mistaken. The talk was when plaintiff was a month or two old. I never heard much about it afterwards.

Mrs. Adeline Hochstetler, of Pennsylvania, seventy-six years of age, testifies:

I knew Adeline McClintock when she was young, but never saw her after she had that child, and never saw the child. I heard people say that she had a child, and that Edward McNeill was its father. My aunt and uncle, Sarah McClintock and Andrew McClintock, and I think Mitchell McClintock, said that. It was generally reported through the community here that he was the father of this child. I was living here, when the child was born, on the same place where I am now. I was born in Somerset county, and have lived here more than 60 years. My mother was a McClintock and related to Edwin McNeill and Adeline. About all I heard was what the McClintocks said, and that is about all I knew of the name she went by, except that it is the only name I ever heard. I never heard anybody talk about the child's father except the McClintocks. It wasn't made very much of a talk about it. There were so many such cases that happened that there wasn't much account taken of it. They said the child was born at Jim McNeill's, where Adeline was confined. I heard the McClintocks and others talk to Jane Tressler.

The plaintiff, as a witness in her own behalf, testifies:

I went by the name of McNeill. So far as I have any recollection, I have never gone by any other name than that. When my mother came to Iowa, she lived on Uncle Neal's place. He was a brother of Ed, and James McNeill was another brother. Neal McNeill is not living, and he died before Edwin did. I went to school in Monona county. I was sent to school by Uncle Neal McNeill. He came over and told me to start to school. At school I gave my name as Etta McNeill. I didn't know Edwin McNeill. I knew he lived around there somewhere, but how far from where we lived I didn't know. I was never at his place, and don't remember of ever seeing him at our place while we were there. We remained in

Monona county about ten months, I think, on my Uncle Neal's
farm. Then my parents moved to Le Mars, on Uncle Marcel-
lus' farm. After we went to Plymouth county, I went to
school in the country under the name of Etta McNeill. I
remember that my mother moved to Canton, S. D., at one time,
and I went with her. I was eleven years old when we went
there, and nineteen when we left Canton. Then I came to
Le Mars and made my home with Uncle Marcellus. My mother
made her home there off and on and when she wanted to, and
when she didn't she stayed at her home at Canton. I stayed
with my Uncle Marcellus all the time after I came from Can-
ton at the age of nineteen, and never had any other home than
that. I have never married. From the time when I could
remember anything, I always knew who my father was; my
mother told me. Edwin McNeill was charged with being my
father. I remember the circumstance of his going to my
uncle's place in Plymouth county. It was in 1895, and he
came with Uncle Andy McClintock. I will tell you what oc-
curred at the time he was there, as near as I can. Uncle Mar-
cellus and I were in the house and they drove up, and Uncle
Andy hollered and called Uncle Marcellus. Uncle Marcellus
went out to the buggy where they were, and I think they spoke
and shook hands, and Uncle Andy asked Uncle Marcellus
where I was, and he told him I was in the house, and Uncle
Andy called me, and I went out, and Uncle Andy asked me
if I knew my father, and I said I didn't know him, and my
father (I supposed he was my father; I was told he was my
father) reached out his hand, and he says, 'I am your father,'
and shook hands with me. It was the first time I had ever
seen him, and of course I didn't know he was my father only
what they said. I invited him to come in the house. He told
me he hadn't but a few minutes to stop, and would rather not,
but I insisted on him coming in, so he came in and sat down,
and I took his hat. Our conversation was in regard to Uncle
Neal McNeill. I asked him how Uncle Neal was getting along.
I hadn't seen him for quite a long time, and I wanted to know
if he was sick, and he told me he was well. At that time
Uncle Marcellus came in the house, and we didn't talk any
more about Uncle Neal; they went on talking. Father asked
how much land he had, and they talked about the land and
about the crops. My father didn't remain there any longer
than half an hour, and then left with Uncle Andy. I never

saw him afterwards or heard from him. He didn't tell me what his business was up there at that time. After I left Monona county, my Uncle Neal came to see me every year until I was twenty-one years old. He came to see me when I was at Canton, and I don't remember that he ever missed a year. I know I looked forward to his visits. He came just once each year, and had no business with me or my mother that would bring him there only just to visit us. He always stayed over night, and on these visits he gave me money. He would give me $5 and $10, and bought me presents and things. I remember only once that he talked about his brother Edwin, and then he told me who my father was; he told me my father's name was Edwin McNeill. At that time I might have been between six and seven years old. I never heard any one else in Pennsylvania say that Edwin McNeill was my father, but they always called me McNeill. Edwin's sisters, Mary and Jane, recognized me in Pennsylvania, and told me they were my aunts. I always lived with my mother while in Pennsylvania, and after I grew up I never looked up Edwin McNeill or attempted to see or bother him in any way. None of the McNeill's, except Uncle Neal, have visited me since we moved from Onawa. Since my mother's death I have visited James McNeill, and am on friendly terms with him now. He recognizes me as his niece, and has said that I am Edwin McNeill's daughter. Neal McNeill never said anything to me of my father, except that he told me when I was in Pennsylvania that Edwin was my father. That was when he came back to Pennsylvania. I was cast out by my father in a certain way, and have felt that during all these years. I never hunted him up or attempted to get him to recognize me before he died, and never visited him at his home in Monona county during the ten months that I lived there. I was too small to visit then, and what was the use of my visiting him there and raising a fuss in the family? I didn't want to go among the rest of them. With reference to the transaction in 1895, after Edwin and I had gone into the house I didn't talk to him about his being my father. He didn't mention a thing to me about it, and I didn't mention it to him. He had told me once, and I guess he thought that was sufficient. He didn't tell me where he had been or where he had come from or anything about it.

Canton, S. D., is across the river west from the southwestern part of Lyon county.

Much of the testimony of plaintiff is incompetent, but there was no objection. The only living sister of deceased denies plaintiff's evidence that she and her sister recognized plaintiff as their niece, and says:

I am seventy-five years old. I have lived in Kansas thirty-one years. Before that I lived in Somerset county, Pa. I knew Adeline McClintock in Pennsylvania prior to 1868, when I saw her, but was not intimately acquainted with her. I never heard or knew that she gave birth to an illegitimate child in the year 1868. I never saw the child that I remember. I heard Adeline was expecting to have a child, and heard she swore it on Edwin, but I never knew that it was born. I never heard who was the father of the child.

As to the transaction in 1895, it should be said further that the testimony is in substance that deceased went to Andrew McClintock's house and stayed there over night, and in the morning he and Andrew together went to the home of Marcellus, where plaintiff was. At neither place did he state his business. He drove out in a livery team, with a driver. Some question is made as to the identity of the person who saw plaintiff at this time and as to whether it was Edwin McNeill. There are some circumstances in the evidence of defendants tending to show that deceased was not there at that time, but it is not very satisfactory, and we should find from the evidence that deceased was there. His purpose may have been to inquire as to the property of James McNeill for the purpose of making his judgment against him. This is the claim of defendants, as we understand it, but there is but little evidence to support it. Deceased was an extensive cattle buyer. The only thing of particular importance in this 1895 transaction is that the witnesses to it say that deceased told plaintiff he was her father. Under the circumstances of this case, it would be a strange thing for him to say. He had ignored her entirely for twenty-seven years, or from 1868 to 1895, and, as plaintiff claims, he came to her then, stayed but a few moments, told her he was her father, talked

of the crops and land, and left, and from that time until his death, twelve years later, she never saw him or heard from him. There is a sharp conflict in the evidence as to whether plaintiff went by the name of Etta Belle McNeill. A number of her witnesses so say, while defendants produce a number of witnesses, neighbors who knew her, and persons who went to school with her in Iowa, who say they never heard her called by that name, but that she went by the name of Etta McClintock. It is not of vital importance, perhaps.

Defendants make some question in the evidence as to the identity of plaintiff, whether she is the person born to Adeline McClintock in 1868, but they do not so contend in argument. We think the evidence is so connected at this point that we should find that she is such person.

We have set out the substance of plaintiff's case, and have not intentionally omitted any material part of the evidence. Some of the evidence is undoubtedly shaded to favor plaintiff. But, conceding it to be true, the sum of it, so far as it relates to, or connects deceased with, the paternity of plaintiff, and his recognition of her, is that he arranged with James McNeill or his wife for Adeline's confinement; that he was charged with the paternity; that he settled the case by paying the mother money; admissions by him; and alleged common report that he was her father. Specific instances of statements by him that he was the father are limited, and then among her close relatives, whose testimony is weakened by other facts shown. Some of such statements were not publicly made, but in private. He did not always admit it. Some of plaintiff's witnesses say that, though they often joked him about it in the presence of others, yet he never admitted it in their presence. Many of the persons closely connected with the parties, and who would be likely to have some knowledge of the matter and shed some light, are dead. The alleged recognition in Pennsylvania covered a very short space of time, at most not more than three or four months after plaintiff's birth and before deceased came to Iowa, and was not

general and notorious, within the meaning of the statute, even in the community where it occurred. At that time plaintiff was very young, and the circumstances shown were at about the time of the birth of plaintiff, when rumors in connection with it would be thickest. Under the circumstances shown in this case, such rumors should be given but little, if any, weight. Some of plaintiff's relatives, who have testified as witnesses, have been exceedingly active in the matter. The circumstances relied upon to show recognition in Iowa are few and limited to a small number of people, and at long intervals. Much the larger part of the record refers to the conduct of the parties in Pennsylvania. The case is not as strong in its facts as *Watson v. Richardson,* 110 Iowa, 673. Fewer witnesses in this case have testified to admissions of deceased than in that case. It was there held that evidence showing that a putative father recognized an illegitimate child as his own in the home of its foster parents, during the first years of its life, and occasionally thereafter, after their removal to another state, is not sufficient to establish such general and notorious recognition by the father as will entitle the child to inherit under the statute. It is well settled that in such cases the evidence should be clear and convincing. Without again stating the rule and the reasons therefor, the following cases may be cited: *Markey v. Markey,* 108 Iowa, 373, and cases cited; *Watson v. Richardson, supra; Holmes v. Connable,* 111 Iowa, 298; *Rosseau v. Rouss,* 180 N. Y. 116 (72 N. E. 916); *Ross v. Ross,* 148 Iowa, 729; *Finger v. Anken,* 154 Iowa, 507.

Under this entire record, and under all the circumstances shown, which we shall not again refer to, it is, to say the least of it, doubtful whether it has been shown that deceased was the father of plaintiff. There are too many circumstances pointing to others who may have been connected with the affair. It is said by plaintiff that Neal McNeill may have been acting for the deceased, but there is no evidence whatever that he was. But, conceding for the purpose of argument that

he was doing so, this would show a disposition on the part of deceased to conceal the fact rather than notoriously admitting and recognizing it, and, if he was doing this, then, clearly, it was not his purpose, and he was not willing at all times, or generally and openly, to recognize the plaintiff as his child. As to recognition, the evidence falls far short of the requirements of the statute. It does not satisfy or convince the mind. The following cases may be cited where the evidence was held insufficient: *Brown v. Iowa Legion of Honor,* 107 Iowa, 439; *Markey v. Markey, supra; Watson v. Richardson, supra; McCorkendale v. McCorkendale,* 111 Iowa, 314; *Duffy v. Duffy,* 114 Iowa, 581; *Brisbin v. Huntington,* 128 Iowa, 166; *Murphy v. Murphy,* 146 Iowa, 255.

We should refer to the evidence on behalf of defendants. This will be done as briefly as may be, and only in a general way. To refer to it otherwise would extend the opinion to unreasonable limits.

Twenty-three witnesses were produced by the defendants, who lived in the neighborhood in Pennsylvania in which the child was born, and where Edwin lived, who never heard Edwin charged with being the father of the child. Some of these lived within a mile and a quarter or a mile and a half from the home of Adeline. It is of some significance that all the persons whom James McNeill referred to as having talked to him about the matter in Pennsylvania, except one, were dead at the time of taking the testimony in this case, and that one stated that he never heard Edwin charged with the paternity of the plaintiff.

Three sons and a daughter of Neal McNeill, who was a brother of deceased, and who was very closely connected with plaintiff and her mother from the birth of plaintiff until his death, a short time before Edwin died, testify for defendants that they never heard that plaintiff was the child of their uncle, Edwin McNeill, or that he had an illegitimate child, and never heard the deceased or any one else mention it. They lived in the same neighborhood in Iowa, a part of the time

at least.  They lived with their father, Neal.  It is claimed by plaintiff that Neal knew that plaintiff was the daughter of deceased.

Many of Edwin's closest neighbors, who had lived by him for years, his intimate friends and business associates, disinterested and apparently credible, testify the same way.

The widow of deceased, whom he married in the same community in Pennsylvania where plaintiff was born, and only two months after her birth, says she never heard of it until after her husband's death.

The children of deceased, some of them nearly forty years of age, testify that they never heard it until after their father's death.

Many of the witnesses, neighbors, and relatives lived in the same community with some of the McClintocks and in the same neighborhood with James McNeill, and the witnesses say they never heard these people, or any one else, mention the matter until after Edwin died.  No one, except James McNeill and a few others, principally relatives of plaintiff, in a few instances, and at long intervals, testify to any admissions or conduct of deceased in Iowa tending to show recognition of plaintiff.  His residence in Iowa covered a period of nearly forty years, or, to be exact, from 1868 until his death in 1907.

The words "general" and "notorious" in the statute have been defined in some of the cases as follows:

General means extensive, common to many, or the majority, but not universal; notorious, not concealed, open, generally or commonly known and spoken of.

Surely it cannot be justly claimed that deceased did generally and notoriously recognize plaintiff as his child, within the meaning of this definition.  Had he done so, some of his closest intimates would have heard of the matter during this long period of years.  It cannot be justly claimed that in his intercourse with his neighbors, associates, and friends he made no attempt to conceal the fact that he was the father

of plaintiff, but acknowledged it openly and publicly and so often as to evidence his willingness that all should understand that he was her father. *Tout v. Woodin,* 157 Iowa, 518; *Hays v. Claypool,* 164 Iowa, 297.

The statute (section 3385) seems to contemplate that the paternity may be established during the life of the alleged parent. · This ought to be done, or, if it is sought to establish the paternity after his death, the proof should be clear and of such character as to convince the mind. This is the rule of all the cases. There may be, and doubtless are, meritorious cases wherein sufficient proof may not be obtainable, resulting in great misfortune to the claimant. Other cases are without merit. The principal actor and others likely to know the facts are dead. In such cases, the widow and heirs are at the mercy of such a claimant, unless the rule as to proof is adhered to. We intend no reflection upon the plaintiff. So far as she is personally concerned, there is nothing in the record to discredit her. It may be that deceased was her father, and that he was shrewd enough and intended to conceal the fact as far as possible and so long as she was willing to permit the matter to rest. If she is his daughter, it is a great misfortune for her to be denied the consolation and reparation to be had by legally establishing her paternity and participating in the patrimony which is rightfully hers. On the other hand, an unfounded claim of this kind cruelly assails the character and reputation of the widow and children and hurts the living by charging infamy upon their dead; but it is a question of proof. There are circumstances in the evidence which, if true, tend to support plaintiff's claim, but, without further discussion of the evidence or law, we are of opinion that, under the entire record, after a careful consideration of all the facts and circumstances in the case, plaintiff has not legally established her claim, and that the judgment of the trial court was right.

The judgment must therefore be, and it is—*Affirmed.*

LADD, C. J., and EVANS and WEAVER, JJ., concur.