Ida McDonald, Administratrix, Appellant, v. Yellow Taxicab Company, Appellee.

EVIDENCE:   Weight and Sufficiency—Interested and Sole-surviving
1   Witnesses.   Testimony by a vitally interested and sole-surviving witness to a transaction is not necessarily sufficient to command a directed verdict.   In other words, the *law* will not necessarily stamp such testimony as 100 per cent credible.   So held where such a witness testified to an act of gross negligence on the part of the deceased, but where the jury might, in view of attendant and relevant facts, have found that the witness was fabricating his story.

WITNESSES:   Impeachment—Contradictory Statements Out of Court.
2   Principle reaffirmed that the relevant statements of a witness out of court different from his relevant statements in court are, on proper foundation, always admissible.

*Appeal from Woodbury District Court.*—George Jepson, Judge.

September 27, 1921.

Rehearing Denied January 17, 1922.

.Action at law to recover damages for the death of deceased. He was a passenger in one of defendant's taxicabs. The car was being driven by one Reed, one of defendant's employees. It is claimed by plaintiff that the cab was overturned, and that deceased was killed because of the negligence of defendant and its driver. The accident happened about 4 o'clock in the morning of October 3, 1919. Deceased and the driver were alone in the car, and both in the front seat. Deceased was instantly killed. No other eyewitness testified as to how the accident happened, except the driver, Reed. Reed testified that deceased, who was sitting by him in the car, became frightened, and grabbed the steering wheel, causing the car to turn and tip over; and that this was the cause of the injury. At the close of all the evidence, the trial court sustained defendant's motion for a directed verdict in its favor, and stated in the record that the ruling was based upon the undisputed evidence of the driver, and that, as a matter of law, deceased was guilty of contributory negligence.—*Reversed.*

*A. C. Hatt, J. A. Berry,* and *Henderson, Fribourg & Hatfield,* for appellant.

*H. W. Brackney* and *Burgess, Gill, Sammis & Boylan,* for appellee.

PRESTON, J.—1. It is alleged, and the evidence shows, that defendant is a corporation, and that, at the time in question, it was engaged in the business of transporting passengers for hire, as a common carrier; that, on the date before stated, deceased employed defendant company to transport him from the main part of the city to Riverside Park in said city, in one of its taxicab automobiles, which was used in transporting passengers; that deceased entered one of defendant's taxicabs, and was accepted by defendant as a passenger therein; and that the taxicab was under the control of and was being operated

1. EVIDENCE: weight and sufficiency: interested and sole-surviving witness.

by one of the employees of the defendant. It is further alleged that, at a certain point on the route, the automobile was overturned, and decedent killed; that deceased was without fault; and that his death was caused by the negligence of the defendant. A number of grounds of negligence are alleged, and they are substantially as follows: Failure to equip the taxicab with nonskid tires; failure to provide the wheels of the taxicab with proper and suitable chains; driving the car at a dangerous and excessive rate of speed, at the time and immediately before plaintiff's intestate was killed; that the driver failed to keep a proper lookout with reference to the condition of the road; that the driver took a dangerous route, when there were other routes which could have been taken which were safe, the taking of which would have avoided the accident, which facts were known by defendant; that defendant's driver failed to properly operate the car or to have the same under proper control; that defendant caused deceased to be transported in an automobile which was unsafe, top-heavy, and unsuitable to be used in transporting deceased, in the condition in which the roads were at the time.

Defendant denies any negligence on its part, and says that the death of plaintiff's intestate was caused by his own negligence.

We assume that, because defendant was a common carrier and deceased was its passenger, the trial court held that there was no burden upon plaintiff to show specific negligence on the part of the defendant, or that negligence in the matters set up as such, or some of them, had been sufficiently shown; since the verdict was directed on the ground that deceased was guilty of contributory negligence. At any rate, that is the principal point argued, and it will, therefore, be the point discussed. The evidence bearing upon that point will be referred to, and a brief reference will be made to some other circumstances.

The park, the destination of deceased, was some five or six miles from the business part of Sioux City by one route, and a mile or a mile and half, perhaps, less by the road taken by defendant's driver and his passenger. The longer or military road was level, after leaving the end of the pavement; whereas the route taken was hilly. There is evidence tending to show

that, at one point on the longer road, the street was torn up, but that, by a detour of a block or two, one could get back into the same street or road; that it is a good road all the way; that the place where the detour was made was through a regular street, with houses on both sides. The car was overturned while proceeding down the last hill before reaching the park, and when the car was about halfway down. The road at that point was about 18 or 20 feet wide, with high banks 10 to 20 feet high on either side. As some of the witnesses put it, there were really no ditches at the side of the road, but the road was rounded up in the center. The taxicab was a Ford town car, with covered top. The front, where the driver sat, was not inclosed. The rear part only is inclosed, but the stationary top extends over both the inclosed and the uninclosed portion. A number of witnesses testifying for plaintiff describe the condition of the road, the position of the car and of deceased under it, the description of the car, and so on. Defendant's witnesses also describe these matters. There is a conflict in regard to some of them. As we understand the record, the general direction of the road taken was northwesterly. .From the testimony of plaintiff's witnesses, it appears that some of them went out to the place of the accident soon after it occurred. They testify that there had been much driving over the road in question during the fair, and that the roads were beaten down hard; that it had rained during the night; that the rain on the clay had made it slippery and greasy; that the road was slippery; that they noticed the tracks of the car in question, where it had slipped and skidded; that the road was crooked, winding, and steep; that the car tipped over at the point of a curve in the road; that the body under the car was found about at the turn, or perhaps a little before the car had made the turn; that the turn was to the left; that this car was tipped over on its side, and was across, or diagonally across, the road and track, with the wheels uphill; that there were no chains on the tires; and that none of the tires were nonskid, but all smooth. Some of them say that there was no equipment for a Ford car, either chains or nonskid tires, that would have prevented the car from skidding, under the conditions as they existed, but that chains or nonskid tires would have been helpful in controlling the car.

One witness puts it that it would make a difference whether you had smooth or nonskid tires, or whether you had chains; that a car with nonskid tires would skid or slip quicker than one with chains; and that it all depends on how a man handles a car; that, under conditions such as testified to, chains would be better than nonskid tires, and nonskid tires better than smooth; that he wouldn't say that it would skid anyhow, under those conditions, even with chains, until he had tried.    Witnesses experienced with Ford and other cars testified that, in going down this steep hill, when the road is of clay and packed, and wet and slippery, with smooth tires and no chains, it would cause the car to skid, and under such conditions, the car would be likely to skid and upset; that, the way in which the body of a Ford car is fastened to the springs, and the manner of suspension, it would cause the body of the car to sway, and render it more likely to tip over.    Some of the witnesses say that the road was so slippery that they slipped in walking down to the body from the top of the hill, and that they slipped so that their feet went out from under them, and they could hardly keep their footing; that they had to put the body down, to rest, in carrying it up.

Another witness for plaintiff says that the hill was about a quarter of a mile long or more; that it comes down through a ravine, with trees and steep banks on each side; that he noticed the tracks which led from the overturned car up the hill; that the tracks were four or five feet from the north bank up to the time the car tipped over, and that, from the appearance of things, there had been a little skidding to that point; that the track he saw was near the right side of the road going west, and showed a little skidding,—not very much; that the road was very slippery.

Another witness testifies that, in going down that hill with such a car, and under conditions as described by witnesses for plaintiff, one would lose control of the car, and it would slue around, and it would be hard to tell which way it would go; that it would probably turn around.    Another says that, under such conditions, one would lose control of the car, and if it started to slip, it would be out of control, and would be apt to turn square around or turn over; that it would be hard to tell

what really would happen; that it would be more apt to turn clear around, unless it hit some obstruction to turn it over; that it would make a difference whether the power was connected; that, as long as you have your wheels turning, you are that much better off; that, going down hill, the possibilities of turning over would be greater than on the level road; that, if it started to swing around, going down hill, it could happen very easily, and at that place it could happen easily; that it could, if it just slued around there, if you turned the car very quickly; that, if you suddenly turned the steering apparatus, it would happen anyhow, whether that was done or not; that it would be very easy for that car to turn over, going down a hill.

One witness describes the position of deceased under the car, by saying that the wheels were uphill and the body was in the automobile, just the head visible; that the head was lying downhill, the opposite from the wheels.

Another witness states that a Ford town car differs from the ordinary Ford touring car only in that it is more top-heavy and has more weight on top, of heavier material; that the adjustment has a tendency to make it sway, causing more swing to the body, because it has only the center point of suspension, whereas in other cars the springs in the rear have two points; that the rear end of the body of the car is fastened by a single bolt in the Ford town car; that with such a car, if it "set level," there would be no more chance of its losing its balance, in moving downhill, and of its skidding, than with any other car, if it was kept going straight ahead; but that, if it did skid or turn sideways while it was going, it would be more apt to tip. This witness says further:

"And if such a car, going downhill, was equipped with smooth tires, and had no chains on, if the car started skidding, you could not hold it,—that is all there is to it."

The widow of deceased testifies that her husband never owned an automobile, so far as she knew, and so far as she knew, did not know how to run one; that he knew nothing about an automobile; that, in September and October, they were living at Riverside Park; that her husband went to and from

the city by the street cars, and so far as she knew, had never ridden there in an auto.

Witnesses testifying for the defendant say that the tracks from the top of the hill to where the car was overturned, showed no sliding or skidding; that it had sprinkled during the night; that there were nonskid Firestone tires on the rear wheels of the car in question, and smooth tires in front. The weather observer testifies that it was cloudy, the morning of October 3d, after midnight, and began raining shortly after 2 o'clock, and continued to rain until close to 4 o'clock. The driver, Reed, says that the destination of deceased was his cottage at Riverside Park, which he, the driver, could have reached, and avoided the hill, by going by the military paved road and then on the level road; that he had driven both the roads before; that deceased said nothing as to the route that should be taken; that witness opened the rear door of the car for deceased, but that he said he had been used to driving himself, and would rather ride in front, and that he got in in front; that witness had driven both roads before. He says further that it had rained some before they started, and there was a very little sprinkle as they started out; that there was not very much rain; that the car had nonskid tires on the rear wheels.

"I do not know whether my car skidded or slid any time until it upset. I have never contended that the car ever did slide. Down the hill where the accident happened, I was driving three or four feet from the right bank. Until the car was upset, it wasn't sliding or skidding at all. Going down that road out there, just as you make a kind of a turn (I was keeping to the right-hand side of the road), the lights at the turn would be right square into the bank, and at that place deceased seemed to become excited or something, that must have caused him to be excited—I was driving, and wasn't looking for anything of that kind to happen, as did happen; and he grabbed the steering gear and gave it a turn, a sharp turn, to the left, and the car upset, and lay on its right side, the front end facing the left bank as you went down. After upsetting, the rear end of the car was four or five feet from the right bank. The road was a smooth one. He wasn't thrown, but the car fell on him. I was not thrown out, was still hanging onto the steering gear.

In a Ford car, they will turn quick, when you turn the steering wheel a little. When deceased grabbed hold of it, the car turned to the left, and I was busy trying to right it, and he must have let go. It was all done in very short order. Just the minute the car was turned, why it took long enough to travel across—not far enough to go into the left bank. She went over, I should say, slow. No part of the glass or any other part of the car was broken. There was mud on the right front fender and on the knob of the right front door, which remained closed. The car was in perfect condition. Right after it turned over, I shut the engine off and got out. The accident happened about 4:15, and the ambulance came at 5 o'clock. When I shut off my engine, there was no light from the car. I lit matches and discovered deceased; tried to get him out. The last hill is not more dangerous than the first. I was going 20 miles an hour from Water Street up to the end of the paving. When I struck the dirt road and had to go down the long hill, I went 10 miles an hour. I went down the second hill at 15 miles an hour. At the time of the accident, I was only going 3 to 5 miles an hour, because it is more natural for a person, if you are driving anywhere near a curve, to go slow. That road, with lots of traffic up and down during the fair week, or meeting cars at the turns, is more dangerous than the other road; but at 4 o'clock in the morning, I should say, with careful driving, it is not any more dangerous. At 4 o'clock in the morning, it requires more careful driving on this last hill than on the first."

"Q. Did you have the power on on the second hill? A. You don't need it until you get pretty near the bottom. Q. Well, did you have your power on? A. I have forgot now. I had my power on on the third hill, because that is always the best way to travel down hill, where you are taking a curve in that road out there, then you have absolutely full control of your car. I never gave it a thought as to whether I could have gotten deceased out there as quickly the other road; it is further. Q. But you have pavement more of the way, haven't you? A. I don't know as it makes much difference."

It will be noticed that witness contradicts Mrs. McDonald as to the acquaintance of deceased with cars and their operation. Witness equivocated somewhat as to which was the better road

and the most traveled. He was asked in chief whether the road he took is generally traveled from the city to the park, and his answer was, "Well, it is the shortest route."

"Q. I didn't ask you if it is the shortest route. I asked you if this is the road that is generally and universally traveled, in going from the city to the park. A. That is the one I always traveled; it is traveled by a large number of people, a large portion of the travel that goes out to the park."

He testifies, however, that he has been both ways. Witness, on cross-examination, equivocated somewhat as to whether the road was wet. The record is:

"Q. But you haven't answered my question,—was the road wet? A. I said it had rained a trifle after we started. Q. But it had rained that evening before you started out? A. Yes, sir. Q. Was the road wet down that hill,—that is what I am asking you? A. Somewhat, yes. Q. Was the road slippery? A. The car didn't slip. Q. Was the road slippery? A. I didn't get out to test it. Q. You got out afterwards,—didn't you walk by where the automobile was turned over? Did you walk up the hill to where the ambulance was? A. Yes, sir. Q. Was it slippery then? A. I had no trouble getting up. Q. Was it slippery then? A. Not to cause me any trouble. Q. You wouldn't say it wasn't slippery? A. It didn't bother me any. Q. Will you say it was not slippery? A. Well, no, I would not say it wasn't slippery."

Witness also contradicts himself as to whether his car skidded. He testifies positively that there was not a particle of skidding shown on these tracks any place from the top of the hill down to where the car was overturned, but, when asked if it slid when they were trying to right the car, he says, "In lifting the car and pulling at it, I don't think it slid an inch."

"Q. It didn't slide a particle? A. I don't think it slid any. Q. What would you say about that? A. Well, now, I wouldn't say,—I can't say."

He testifies further:

"Q. Do you say that the road which you took is the one most frequently traveled when the road is wet and slippery? A. I wouldn't say that. Q. You don't say that? A. No, sir. Q. You won't pretend that? A. No, sir. During the

worst of the weather, a person would naturally take the other road. If it was very slippery, the other road would be the best. Q. Why? A. On account of the hill. Q. On account of the danger of using the wet road with the hills, isn't that true? A. Yes, sir. Q. And you knew that, didn't you? A. Yes, sir. Q. You knew that last October? A. Yes, sir.''

There is other evidence on these and other matters. Perhaps we have set out too much of the evidence, but we have attempted to set out enough, and only enough, to show the general situation and conditions. As said, the trial court stated that, because Reed testified that deceased grabbed the wheel, and because this was not contradicted by any other eyewitness, there was no dispute in the evidence; and that, therefore, deceased was, as a matter of law, guilty of contributory negligence. Appellee argues that plaintiff's case is based upon the supposition that the roadway was very slippery and muddy; that the road was dangerous; that the automobile was defective in design, was not equipped with nonskid tires or chains, and was going at a reckless rate of speed. Though there is a conflict in the evidence as to some of these matters, we are of opinion that the jury could have found as claimed by appellant. Appellee says that appellant ignores the sole cause of the accident, which was the negligence of deceased in grabbing the steering wheel and turning the car sharply to the left, which caused it to upset. But in such argument, appellee assumes that there is no conflict on the question of the alleged contributory negligence of deceased. But taking into consideration all the testimony and all the circumstances, and the contradiction in the testimony of Reed and his equivocation, at some points, we are of opinion that it was a question for the jury. Without again stating all the circumstances, the jury could properly have found that Reed was not going down the hill slowly, or with proper care, and that he did not have his car under control; that the grounds of negligence, or some of them at least, had been established. According to Reed's theory, there was no necessity for driving slowly, because he says at one point in his testimony that it was no more dangerous than the other hills, and that he had been traveling much faster down the other hills. The jury could properly have inferred that he did not

have his power on. The evidence shows that that would be the better way. Reed says he is not sure whether he had it on on the other hills, and that it was not necessary to have it on until arriving at the foot of the hill. The jury could have found from the evidence that the road was very slippery, and that this car did skid and slip, and could have found that, under the conditions shown, it was not only possible, but likely and probable, that the car would tip over, even though deceased had not grabbed the wheel. In short, the jury could have found, from all the circumstances, notwithstanding Reed's statement, that deceased did not grab the wheel.

There are other inferences which might be drawn from all the evidence, but we shall not go into them further. It must be remembered that here was a tragedy in which a person lost his life. Reed was charged with being the cause of it. He might, perhaps, be liable, as well as defendant, for damages. There was a powerful incentive on Reed's part to shield himself. The mouth of the only other person present is closed. Under such circumstances, and under this record, neither the court nor the jury was compelled to blindly believe every word Reed said, and just as he said it. It may have occurred just as he says. We do not assume to say whether it did or not; but it was a question for the jury. Appellant cites *Bacus v. Chicago, B. & Q. R. Co.*, (Iowa) 118 N. W. 751 (not officially reported), as holding that, although there be but one eyewitness to a transaction, his testimony is not necessarily conclusive, and that a different condition may be satisfactorily established by the facts and circumstances appearing in evidence. We think this is especially so where the only other person or witness to the transaction is dead. We have so held in numerous cases. In *Markey v. Markey*, 108 Iowa 373, a bastardy case, speaking of the question of recognition, the court said that such evidence cannot, in the nature of things, be controverted, and that for that reason it should be carefully scrutinized, and received with caution. It is also necessary to remember that, in these cases, from the nature of the evidence given, it is not subject to any worldly sanction, it being obviously impossible that any witness could be convicted of perjury for speaking of what he remembers to have been said in a conversation with a deceased person.

In *Watson v. Richardson,* 110 Iowa 673, 678, also a bastardy case, language similar to that in the *Markey* case was used, and further, that such testimony must necessarily be tested by its own inherent probability or improbability, by comparison with other evidence in the case, and by ordinary rules of human conduct under similar circumstances.

In *Holmes v. Connable,* 111 Iowa 298, 301, an action in equity, to enforce specific performance of an oral promise of a person deceased, the court said:

"We wish to say something as to the rules that should govern courts in passing upon cases of this kind. It will not do, as plaintiff's counsel seem to think proper [and as the court did in the instant case], to hold that, because a certain number of witnesses have testified to the making of the contract, and none have been called to deny it, plaintiff's case is established. The lips of the only two witnesses who could deny it are forever closed. The only person who could controvert the admissions alleged to have been made is the dead man, against whose estate this claim is produced. There is no defense that can be made, save as it may be found in the improbability of the stories of plaintiff's witnesses, when tested by comparison with other evidence in the case, or the ordinary rules of human conduct under similar circumstances."

The same case quotes from *Wallace v. Rappleye,* 103 Ill. 229, to the effect:

"It is incumbent upon the court to look upon such evidence with great jealousy, and to weigh it in the most scrupulous manner, to see what is the character and position of the witnesses generally, and whether they are corroborated to such an extent as to secure confidence that they are telling the truth."

And from a Pennsylvania case:

"The temptation to set up claims against the estates of decedents—particularly such decedents as have left no lineal heirs —is very great. It cannot be doubted that many such claims have been asserted which would never have been known, had it been possible for the decedent to meet his alleged creditor in a court of justice. Such claims are always dangerous, and when they rest upon parol, they should be strictly scanned," and so on.

In other words, the court holds that such a claim cannot be considered as established, as a matter of law, because witnesses have testified to the making of the contract, and none have been called to deny it. The *Holmes* case is cited and followed in *Bremer v. Haag,* 151 Iowa 449, 452; *Young v. McClannahan,* 187 Iowa 1184, 1191; *Ross v. Ross,* 148 Iowa 729, 733; *Finger v. Anken,* 154 Iowa 507, 511; and *In re Estate of Chismore,* 166 Iowa 217, 223. In the last named case, at page 224, it is said:

"It has been frequently held, not only by this court, but by others, that uncontradicted evidence is not sufficient to command a directed verdict, where the inferences to be drawn from all the facts and circumstances are open to different conclusions by reasonable men."

See, also, *McNeill v. McNeill,* 166 Iowa 680, 701; *Bohen v. North American L. Ins. Co.,* 188 Iowa 1349.

Some members of the court prefer to put their concurrence on the ground that defendant was a common carrier, and that the burden was on it to explain the circumstances of the fatal accident consistently with its own freedom from negligence.

2. We think the trial court erred in excluding certain evidence tending to impeach Reed, and plaintiff's attempt to lay a foundation for that purpose. After he had been asked and he had answered as to his talking with Weisz or Shinkle on the hill, at the time they came out with the ambulance, soon after the accident, he was asked:

**2. Witnesses: impeachment: contradictory statements out of court.**

"Q. I will ask you whether or not, at that time, you didn't state that you were going down the hill, and the rear end of the car started to skid, and you thought you would let it skid to the side of the bank. Did you say that to Mr. Shinkle or Mr. Weisz, or words to that effect, at that time? (Objected to as not proper cross-examination, incompetent. Sustained as not proper cross-examination. Exception.)"

The witness had stated in chief that his car did not skid at all. An affirmative answer to the question would have shown that it did skid, and thus would have contradicted his testimony in chief. Had he denied it, and had the other witnesses testified that he did so say, it would have the same effect. Furthermore, if he so stated, and did not then claim that deceased grabbed

the wheel, the evidence sought to be elicited might tend to show that Reed's claim that deceased grabbed the wheel was an afterthought, to shield himself. The inquiry was as to a conversation occurring at the place where the accident occurred, and very soon afterwards. It was cross-examination, and competent. Appellant cites at this point *Reynolds v. Smith,* 148 Iowa 264. It seems needless to discuss this point further.

It is thought by appellant that, even though deceased did take hold of the wheel, he was acting in an emergency. Appellee contends otherwise. This and one or two other questions are argued; but, having decided the point most argued and relied upon, we shall not extend the opinion to discuss the other questions. For the reasons given, the judgment of the district court is reversed, and the cause remanded.—*Reversed.*

EVANS, C. J., WEAVER and DE GRAFF, JJ., concur.