CORDELIA M. HOLMES, Appellant, v. HOWARD L. CONNABLE et al.

**Claims Against Estate:** NOT ESTABLISHED AS A MATTER OF LAW. Where a claim against an estate devised to others is based on an alleged oral contract with decedent, and no witness who could deny the contract is living, such claim cannot be considered as established, as a matter of law, because witnesses have testified to the making of the contract, and none have been called to deny it, because the defense may arise from the improbability of the testimony given.

SAME: *Evidence.* Plaintiff in 1897 alleged that deceased orally promised in 1856, after having known her and her parents but one day, to give her a child's share in his estate. Plaintiff's mother testified that deceased stated to her that, if plaintiff stayed with him until grown she could share in his estate with his children, and that he would do as good a part for her as one of his own children. There was evidence that the taking of plaintiff by deceased was a relief to her mother, and plaintiff's sister testified to the same promise. Plaintiff lived with decedent until 1865, and, though residing in an adjoining county saw him but once thereafter, and testified to no further conversation relating to the promise. Letters written by decedent were produced and portions claimed to be material, being

missing, were supplied by plaintiff's testimony, though wit-
nesses testified they saw such written portions several years
before, and two witnesses, friends of plaintiff, who had given
a chattel mortgage to decedent which had been foreclosed, tes-
tified to statements tending to support plaintiff's claim. *Held*,
that such evidence was insufficient to support the agreement.

**Appeal:** DENIAL OF ABSTRACT: *Timely filing not always essential.*
3   Where no prejudice is shown to have resulted from failure to
file the denial of an abstract in time, a motion to strike such
denial from the files because of such failure will be overruled.

*Appeal from Lee District Court.*—HON. HENRY BANK, JR.,
Judge.

THURSDAY, MAY 10, 1900.

ACTION in equity to enforce specific performance of an
oral promise of one A. L. Connable, now deceased, to give
plaintiff a child's portion of his estate. Defendants are the
devisees and executors of such estate. From a decree dis-
missing plaintiff's petition, she appeals.—*Affirmed.*

*Moses A. McCoid* and *H. Scott Howell & Son* for
appellant.

*James C. Davis* for appellees.

WATERMAN, J.—Cases of a similar nature to this are
finding their way into the courts with alarming frequency
of late years. We have here an attempt to secure, upon oral
evidence, a large share of a valuable estate in probate, and
the facts given to support it are mostly of such a character
as not to be open to direct denial. We shall pass a number
of defenses, such as election of remedies, statute of limita-
tions, former adjudication, indefiniteness of the contract,
and that it is against public policy, and address ourselves to a
consideration of the testimony. And in doing this we shall
take the claimant's evidence as she has given it, though part
of her testimony should perhaps be excluded, under the

statute. A brief outline of the facts will serve to show the applicability of certain rules of law to which we desire to call attention before proceeding to a critical analysis of the evidence: One A. L. Connable, a resident of Keokuk, died on the fifteenth day of April, 1894, leaving a will by which his entire estate, of some two hundred and fifty thousand dollars, was devised to his three sons, his only children; and, so far as then appeared, these were the only proper objects of his bounty, for his wife had previously died. Nearly three years after the probate of the will, this claim was first made. Plaintiff asserts that when a small child she was taken into the family of Mr. Connable, with her mother's consent, on an oral promise by him that, if she would remain until she was grown, he would give her on his death a share of his estate equal to that of his own children. This was in the year 1856. There is no dispute but that plaintiff spent some years in the family. We shall accept her statement that she remained until the year 1865. She then left, and went to Jefferson county in this state, where she has since resided. It is conceded that since the year 1865 plaintiff has never visited the Connable family, though they continued to live in Keokuk; that she saw Mr. Connable but once in all this time; that none of his family ever visited her, and there was no communication between her and any of them, save some letters, of which we shall have more to say in proper time. The oral contract is said to have been made in the presence of Mr. and Mrs. Connable, both dead, and of plaintiff, with her mother, brother, and sister. There is also evidence from three witnesses of declarations by Connable to the effect that plaintiff was to share his estate with his children, or that he had agreed she should do so. Some lost and mutilated letters, the contents of which are supplied by oral evidence, are also relied upon to support the claim. This will give an idea of the character of the case presented by plaintiff.

Before going into details, we wish, as already suggested, to say something as to the rules that should govern courts in passing upon cases of this kind. It will not do, as plaintiff's counsel seem to think proper, to hold that because a certain number of witnesses have testified to the making of the contract, and none have been called to deny it, plaintiff's case is established. The lips of the only two witnesses who could deny it are forever closed. The only person who could controvert the admissions alleged to have been made is the dead man against whose estate this claim is produced. There is no defense that can be made, save as it may be found in the improbability of the stories of the plaintiff's witnesses, when tested by comparison with other evidence in the case, or the ordinary rules of human conduct under similar circumstances. *Watson v. Richardson,* 110 Iowa, 673; *Laurence v. Laurence,* 164 Ill. Sup. 367 (45 N. E. Rep. 1073); *Wallace v. Rappleye,* 103 Ill. 229, 665. In this last case, which bears some similarity to the one at bar, in its facts, the court said in relation to the oral evidence offered: "It is incumbent on the court to look upon such evidence with great jealousy, and to weigh it in the most scrupulous manner, to see what is the character and position of the witnesses generally, and whether they are corroborated to such an extent as to secure confidence that they are telling the truth." So, on the same subject, the supreme court of Pennsylvania said: "The temptation to set up claims against the estates of decedents—particularly such decedents as have left no lineal heirs—is very great. It cannot be doubted that many such claims have been asserted which would never have been known, had it been possible for the decedent to meet his alleged creditor in a court of justice. * * * Such claims are always dangerous, and when they rest upon parol they should be strictly scanned. Especially when an attempt is made, under cover of a parol contract, to effect a distribution different from that which the law makes, or that which the decedent had directed by his will, it should

meet with no favor in a court of law. Even if such contract may be enforced, it can only be when it is clearly proved by direct and positive testimony, and when its terms are definite and certain. The danger attendant upon the assertion of such claims requires, as was said by Chief Justice Gibson in reference to a somewhat similar contract, that a tight rein should be held over them, by making the quality, if not the sum, of the proof a subject of inspection and governance by the court, and by holding juries strictly to the rule described." *Graham v. Graham's Ex'rs,* 34 Pa. St. 481. See, also, *Pollock v. Ray,* 85 Pa. St. 431; *Shakespeare v. Markham,* 72 N. Y. 403; *Mundorff v. Kilbourn,* 4 Md. 459. Bearing these rules in mind, we shall now take up the testimony in detail:

Plaintiff's father, Stephen Finney, was a brother of Mrs. A. L. Connable. He died in the year 1855 in the state of Alabama, where he then resided with his family. His father, who lived in Jefferson county, Iowa, sent the widow a small sum of money; and, thus aided, she started in the year 1856 for the grandfather's home. Mrs. Finney (now Holmes) had seven children, and these she brought with her. Plaintiff, the third child, was at this time nine years old; her elder brother and sister being, respectively, eleven and thirteen years. The family reached Keokuk on the night of a Saturday in May, 1856. None of them had ever met Mr. Connable, but on Sunday morning two of the children were sent out to find him. This they did, and he took the whole family from the hotel where they were stopping to his home, where they remained until the Tuesday following, when the mother and six children pursued their journey, leaving plaintiff behind. The claim is that on Monday Mr. Connable proposed keeping the plaintiff, and after some consideration the mother and child consented. The terms upon which the child was taken are thus stated by the witnesses: The mother says: "My older children were present, and Mrs. Connable. I was talking about leaving the next day,

and he [Mr. Connable] said I had better leave Cordelia
with him.   I told him I would hate to give up one of my
children, but would study about it awhile.   He did not say
anything more until afternoon, and then he asked me if I had
made up my mind to let Cordelia stay; if I would let her
stay with them until she was grown, she would share equally
with his children in his estate at his death."   On cross-ex-
amination she tells of the agreement in this way:  "Mr.
Connable wanted to know if I would leave Cordelia
with them, as one of the children; if I would, he would
do a good part by her as he would by one of his own children,
if she would stay there until she was grown."   If the agree-
ment was in the indefinite form last stated, no court would
enforce the claim to an interest in the estate.   It might well
mean only that he would treat her as a child of his own so
long as she remained with him.   But, take the statement
made on direct examination, and we have this man, with
children of his own, offering to divide their inheritance with
a strange child, of whose disposition and character he was
wholly ignorant.   That this is a strong circumstance to be
considered, see *Wilson v. Heath* (Sup.) 53 N. Y. Supp. 168.
If the offer was merely of a home to one of the children, we
can well believe it might have been induced by pity for the
condition of the family, and because of the slight bond of
relationship that existed.   There seems to be a claim by
counsel that the mother would not have parted with her
child but upon a liberal promise as to its future welfare.   We
can hardly reconcile this with the fact that about a year from
this time she parted with others of her children, who left
her to live with different friends and relatives in the vi-
cinity of her home.   That her maternal love was not of the
most sensitive and tender kind is further shown by the fact
that two of her daughters (one the plaintiff) were married
near where she resided, and she did not attend either wed-
ding.   She says, "I was not in the habit of attending my
daughters' weddings."   We can well believe that the tak-

ing of her daughter Cordelia by Connable was a relief to her, rather than a sacrifice.

We come now to the testimony of the three children who were present when these conversations occurred:

Laura, who gives her evidence in the state of Oregon, where she resides at present, was thirteen years of age when Cordelia was taken. In 1897, after a lapse of more than forty years, she remembers that Connable promised that her sister "should share equally in his estate, as one of his own children." In one of her letters written while arrangements were being made to take her testimony, she says, speaking of the occurrences at Keokuk: "I was young,— thirteen years old; had the care of the other children; and, amid the confusion, I at the same time trying to hear the agreement, could not catch all that was being said. * * * My health is bad, and memory poor." Notwithstanding her poor memory, the witness repeats Connable's promise in almost the same words used by her mother, brother, and sister; and on cross-examination she is led to recall one remark of Connable which none of the others mention. He said: "He had property, and would leave her [Cordelia] a fortune." There is one criticism of the testimony of this witness which applies equally to that of the other children. They were all of an age in 1856 when considerations of gain would not console them for a forced separation. The love of a child cannot be bought, nor its grief assuaged, by alluring prospects of the future. It lives in the present, and borrows but little either of joy or sorrow from the time to come. One would naturally suppose that on such a trying occasion, when one of their number was to be left with strangers, the agony of the parting would exclude from their minds all the sordid considerations by which it was brought about.

Theodore Finney, the brother, who was eleven years of age when the transaction occurred, about which he testifies, remembers definitely but little of the visit to Keokuk;

makes a mistake as to the day of their arrival, as to the time of meeting Connable and going to his house, and the length of their stay there; but, through all the vicissitudes and changes naturally incident to the long period that elapsed between that time and the date of giving his testimony, he has retained with startling accuracy in his mind the fact that Connable said his sister should "fare and share equally with his children at his death." It was a part of the conversation in which a child would have no interest, and it is the only part which he distinctly remembers.

The plaintiff is the last witness to the alleged contract. Her youth would seem to render it improbable that she could recall any of the business details, but she is able to repeat just what each person said. Connable's promise was that on his death she should "fare and share as one of his children." Indeed, this witness was so precocious that she noticed just the part she took in the conversation, and, strange to say, it chanced to be such a part only as to give some ground for counsel's claim that she is not disqualified under the statute. She never spoke, she says, until the contract between her mother and Connable was made, and then she consented to stay. Had the child been looking to preserving her competency as a witness in anticipated litigation after Connable's death, her conduct could not have been more discreet. The witness says she remembers the conversation as well as if it had occurred "last week;" that ever since it took place she has kept in mind the fact that she had a contract which was performed on her part. Yet, in a letter to one of the defendants, after Mr. Connable's death, she says: "I was to share equal had I stayed until I was 18 years. I was past 17 when I left." She left Mr. Connable in 1865, and, although she resided thereafter in an adjoining county, never visited Keokuk but once, and that was in 1892, when she was called to Montrose, some twelve miles distant from Keokuk, by the

illness of a relative, and went on to the latter place, and
stopped over between trains. She saw Mr. Connable then,
and, with the exception of some letters of which we shall
next speak, this was the only communication between them
during the years that passed after she left his home. She
claims that Mr. Connable wrote her many affectionate letters
after her departure. Most of these, she says, were de-
stroyed. We can allow this part of the testimony no weight.
She produces five letters. Three of them relate to a second-
hand sewing machine which he sent her in response, evi-
dently, to a begging letter. Another, written in reply to a
letter from her complaining of an injury she had received
in an accident, contained an inclosure of five dollars as a
Christmas present. The fifth of these epistles deserves
more attention. It affords a key to the character of plain-
tiff's case. It was in a mutilated condition,—said to have
been gnawed by mice,—and the only part of any import-
ance is what does not appear. We have a photographic copy
before us, and will try, by reproducing words and lines, to
give some idea of the document and its condition. We shall
copy only such part as is sufficient to make the testimony
understood, for there is only one paragraph that is material.
                    "Keokuk Iowa Oct. 23 1889.
"Mrs. Cordelia Holmes.                         .
    "My dear Niece.
          "Your   very   kind   and   affec——at———this
m ——————————————————————I am ——————
——————————————————————————————— you
may never suffer for the want of bread and clothing, for
yourself and children. You say you owe Mr. Risk $35
balance on your sewing machine and through," etc.
    Plaintiff testifies that the blanks shown were originally
filled so that the letter read: "Your very kind and affec-
tionate letter due this morning. I was very glad to hear
from you. I am going to arrange my affairs and will you

money enough, that you may never suffer for the want of, etc. In this she is corroborated ,by several witnesses who claim to have read the letter at the time it was received, and who testify from independent recollection of what they saw in it in 1889; for the letter was put away shortly after its receipt, and not seen again until 1894, when it was found in its present condition. Indeed, one of the witnesses did not see it after reading until 1897. Aside from plaintiff's husband, who gives only the substance, the other witnesses, with one exception, agree exactly as to the missing words. It is an amazing exhibition of memory. Two of these witnesses are daughters of plaintiff; another, a sister-in-law; and finally her husband, of whom we need only say that, if he is the kind of person plaintiff describes him as being, in her letters to Connable, we can well believe his interest might color his recollection. It is a singular fatality that the vital sentence in this letter should be the one that is missing. But, whatever the words were that originally filled the spaces we have left blank, we feel confident they were not the ones which plaintiff seeks to insert. A business man would hardly use the word due for "received," yet most of the witnesses unite in saying that was the form of expression. In view of various letters written by plaintiff to defendants, and introduced in evidence, we may well conceive that the epistle to which this letter of Connable's is a reply was one pleading poverty. ⁻ If this is so, the blanks might reasonably be filled with an expression of regret on the writer's part for her condition, and a hope that she might not suffer, etc. He was bound by a contract, as plaintiff says, to give her the one-fourth of his estate. There was, therefore, no call for him to say that he would will her enough to keep herself and family from suffering for bread and clothing. Another circumstance worthy of notice is that, while the writer is promising here to will her a share of his estate, the will was then in existence, whose terms she now seeks to set aside. There is no evidence that any in-

fluence was exerted upon the testator to balk his intention. He wished to give plaintiff a share of his estate. He had time and opportunity to put this intention into effect, but he never did so. But we do not rest our criticism of this letter here. Taking the fac simile as we have it in the record, we find that the average number of words on a line is six; in most cases, where the words are of ordinary length, there are but five; in only three instances on its two pages, and where the words used were short, we find seven; never more than this. Now, if we fill the third, fourth, and fifth blank lines with the words sought to be supplied, we have twenty-three words, or eight for each of two lines and seven for the other, and many of them words of more than ordinary length. In the blank in the third line, especially, it appears impossible to insert the words claimed as missing. Altogether, this letter has such a suspicious look that we do not feel warranted in allowing it any weight. It is the only document produced that is of any importance, and upon the issue involved it cannot speak for itself. We have in it nothing, after all, but the oral testimony of interested parties and relatives, to an improbable statement.

II. But it is claimed that plaintiff's case is supported by the testimony of disinterested witnesses, and we turn our attention now to that branch of the controversy. Andrew Brown, eighty-eight years of age (a mere acquaintance of decedent), testifies that in 1856 Connable talked of taking one of his daughters; spoke jestingly of trading one of his own boys for a daughter of Brown; said he would give Brown's daughter an equal share of his estate. Two years later Brown saw a little girl on the porch of Connable's house, and asked if she was going to stay. Connable replied that she was, and added: "If she stays with me until my death, I will make her an heir of my property, the same as my other children." This old man says his memory is not good, but it is only a memory marvelously retentive that could preserve accurately through so many years

such a trivial incident.  It will be noticed that what was said does not conform to the promise claimed by plaintiff to have been made by Connable, and also that it is expressive of an intention, rather than an obligation.  Mr. and Mrs. McIntosh (the latter a long-time friend of plaintiff) also testify to declarations made by Connable.  It is proper to preface what they say with the statement that some of their furniture was taken under chattel mortgage by one of the devisees or the executors of the Connable estate.  These parties rented a house from the deceased, but they had no previous intimate acquaintance with him.  The wife had never even spoken to him before the time' when he made her his confidant.  Yet they would have us believe that on three occasions (once to the husband, and the other times to the wife) Connable told that about his private affairs which he never divulged to any of his many close friends and associates.  What he said, in effect, was that plaintiff was to share in his estate.  The first two conversations are fixed as having occurred in 1891, when plaintiff had been absent for twenty-six years, during which time Connable had never seen her.  The third conversation is said to have been with Mrs. McIntosh, at her house, on the day of the school election in 1894, but there is evidence to show that at this time Connable was so ill that he could not have left his home.  On this last occasion Connable is represented as saying to this woman: "There is Cordelia. I have not yet attended to her business, and she knows and you know I promised to make her share equally with my own children."  A singular expression, for this witness knew nothing of the matter, save what Connable had told . her.  A singular anxiety, too, about a duty which could' have been performed by adding a line or two to his will. But, if we accord all honesty of purpose to such witnesses, it must be remembered that these are admissions made in random conversations.  This court has said: "Than this, no species of testimony is more dangerous, or received with

greater caution." *Cooper v. Skeel,* 14 Iowa, 581. See, also, *Wilmer v. Farris,* 40 Iowa, 310. 1 Greenleaf Evidence, section 200. This is the plaintiff's case. That Connable, when he took her into his family, agreed to treat her as one of his own children as long as she remained, is quite likely, and it appears that he so did treat her. That he promised anything more than this is rendered improbable by every circumstance of the transaction, and by the conduct of all parties during the years after plaintiff left his house. These improbabilities are not overcome by the dubious testimony offered to support the claim made.

After a careful consideration of the facts, we are forced to the conclusion that the decree of the district court, dismissing plaintiff's petition, was fully warranted. The motion to strike the denial of appellee's abstract because not filed in time will be overruled. No prejudice appears to have resulted from the delay.—AFFIRMED.