[No. 28514.   *En Banc.*   October 10, 1942.]

HILDA SUNDSTROM, *Appellant,* v. SUSAN C. SUNDSTROM, *Individually and as Administratrix, Respondent.*[1]

[1]Reported in 129 P. (2d) 783.

104

*J. P. Wall,* for appellant.

*James M. Ballard* and *Philip Tindall,* for respondent.

STEINERT, J.—Plaintiff originally instituted this action against the New York Life Insurance Company to recover the proceeds of a policy it had issued upon the life of her son, and in which she was designated as the beneficiary. The widow of the insured having asserted a claim to the proceeds at about the same time, the insurance company paid into the registry of the court the face amount of the policy less the amount of certain unpaid loans against it. Thereafter, with the approval of the respective claimants, the court entered an order releasing the insurance company from further liability, discharging it from the action, and substituting as defendant in its stead the widow of the insured, individually and as administratrix of her husband's estate. The widow then answered and cross-complained, setting forth her claim to the fund held in the registry of the court. Upon a trial without a jury, the court entered a decree awarding the fund to the widow, but directing her to apply a portion thereof to the payment of certain claims against her husband's estate (including a seventy-dollar balance for board due to his mother) which the widow had consented,

during the course of the trial, to assume. The plaintiff has appealed.

On October 7, 1919, George Sundstrom, then eighteen years of age, procured from the New York Life Insurance Company a policy of insurance upon his life, with premiums payable annually for a period of twenty years. He designated appellant, his mother, as beneficiary and delivered the policy into her possession. The policy contained a provision for assignment reading as follows:

"Any assignment of this Policy must be made in duplicate and one copy filed with the Company at its Home Office. The Company assumes no responsibility for the validity of any assignment."

It also made provision for change of beneficiary, as follows:

"The Insured may at any time, and from time to time, change the beneficiary, provided this Policy is not then assigned. Every change of beneficiary must be made by written notice to the Company at its Home Office accompanied by the Policy for indorsement of the change thereon by the Company, and unless so indorsed the change shall not take effect."

On December 16, 1928, which was more than nine years after the issuance of the policy, the insured married the respondent, Susan C. Sundstrom, and about four years thereafter, on October 28, 1932, made his wife the beneficiary thereof by giving the insurance company the required notice of change and obtaining the endorsement of her name thereon. The circumstances and conditions under which that change was effected, as claimed by respondent and found by the trial court, give rise to the central issue upon this appeal and will be set forth at greater length a little later herein.

As thus changed, the policy retained its form and

effect until the latter part of January, 1940. On January 13th of that year, respondent instituted an action for divorce against the insured. Summons and complaint were served upon him on January 23rd. Two days later, the insured substituted appellant in place of respondent as beneficiary under the policy by again giving the prescribed notice to the insurance company and obtaining an endorsement of appellant's name as such beneficiary on the insurance contract. This change of beneficiary did not become known to respondent, however, until after the death of the insured. In the meantime, the divorce action proceeded to trial and an interlocutory decree was entered on May 3, 1940. Before the expiration of the period of six months necessary to the entry of a final decree of divorce, the insured died, on August 3, 1940. Respondent did not learn of the insured's death until a week or ten days after its occurrence. She thereupon made application to the insurance company for payment of the proceeds of the policy to her, and was then informed for the first time that appellant had been substituted in her place as beneficiary.

Shortly thereafter appellant instituted this action, seeking judgment against the insurance company for the face value of the policy, less any offset which the company might establish. Upon the trial, the court below made findings of fact in which it specifically found, among other things, that the insured, during his lifetime and pursuant to an oral agreement with respondent, had made an equitable assignment of the policy and its proceeds to her. The propriety of that finding constitutes the principal question to be decided upon this appeal.

It is conceded that there was never any *written* assignment of the policy to respondent and, further, that the insurance company was never advised, prior to the

death of the insured, that he had ever assigned the policy to her. The issue here is simply whether the transaction between the insured and the respondent with reference to the policy, as hereinafter more specifically related, constituted an equitable assignment of the proceeds thereof to respondent, entitling her to the fund now in the registry of the court.

It is the law in this state, as elsewhere generally, that, in the absence of express statutory or enforcible contractual provisions to the contrary, a parol assignment of a life insurance policy accompanied by delivery of the instrument operates as an equitable assignment of the proceeds thereof. *Seattle Ass'n of Credit Men v. Bank of California,* 177 Wash. 130, 30 P. (2d) 972; 6 Couch, Cyclopedia of Insurance Law (1930) 5195, § 1458d; 29 Am. Jur. 411, Insurance, § 509; 37 C. J. 425, Life Insurance, § 129. No statute forbidding parol assignments of life insurance policies has been called to our attention.

It is also the settled rule in this state, in accordance with the great weight of authority, that a provision in a life insurance policy requiring that an assignment be in writing, or that it be filed with the insurance company, is for the benefit of the insurer, and only the latter can raise the objection that the requirements of such a provision have not been satisfied. *Seattle Ass'n of Credit Men v. Bank of California, supra; Massachusetts Mut. Life Ins. Co. v. Bank of California,* 187 Wash. 565, 60 P. (2d) 675; 6 Couch, Cyclopedia of Insurance Law (1930) 5196, § 1458d; 29 Am. Jur. 412, 413, Insurance, §§ 509, 510; 37 C. J. 430, Life Insurance, § 140; note (1937) 111 A. L. R. 709. In this case, the insurer has not raised any question as to the validity of the assignment, but, on the contrary, has waived the right to do so by impleading the parties claiming the fund.

■ The dispute between the present litigants is not in reference to the nature or effect of an established equitable assignment, but rather whether the evidence in this particular case was sufficient to prove that such an assignment was in fact made. In our consideration and determination of that question we proceed upon the accepted principle that, in order to work an equitable assignment, the assignor must have intended to transfer a present interest in the debt or fund or subject matter and, pursuant to such intention, must have made an absolute appropriation of the thing assigned, relinquishing all control or power of revocation over it, to the use of the assignee. *Nickerson v. Hollet,* 149 Wash. 646, 272 Pac. 53; *Sneesby v. Livington,* 182 Wash. 229, 46 P. (2d) 733; *Philip v. Seattle,* 195 Wash. 386, 81 P. (2d) 279; 4 Am. Jur. 288, Assignments, § 76; 5 C. J. 909, 912, Assignments, §§ 78, 79; 6 C. J. S. 1101 *et seq.,* Assignments, § 58. What amounts to a present appropriation constituting an equitable assignment is thus a question of intention to be gathered from a consideration of the language used, in the light of all the attendant facts and circumstances. *Tobin v. Insurance Agency Co.* (C. C. A. 8th, 1935), 80 F. (2d) 241; *Wakefield, Fries & Co. v. Parkhurst,* 84 Ore. 483, 165 Pac. 578; *Donaldson v. Lynch,* 247 S. W. (Tex. Civ. App.) 565; 4 Pomeroy, Equity Jurisprudence (5th ed. 1941) 811, § 1282, and cases there cited; 6 C. J. S. 1102, Assignments, § 58. ·

With these rules in mind, we turn to a consideration of the evidence upon which the trial court based its findings of fact. That evidence is found largely, though not entirely, in the testimony given by the respondent. As already stated, George Sundstrom procured the policy on his life in 1919, naming appellant his beneficiary and immediately delivering the policy to her. Some years later, George became af-

flicted with arthritis and never fully recovered from that malady. Owing to his affliction, he lived with his parents during the years 1926, 1927, and 1928, for which they charged him board at the rate of seven dollars a week. By December 16, 1928, the date of his marriage to respondent, his indebtedness to his parents for board amounted to five hundred eighty dollars.

George had been going with respondent since 1925, but his parents objected to his marrying her before his debt to them had been paid. The attitude of his parents gave him much concern, and, as a consequence, he and respondent were secretly married in San Francisco, where both were then living. The parents did not learn of the marriage, however, until the following spring. After his marriage, George continued to manifest concern over the debt owing to his parents and frequently discussed the matter with respondent. "He hated to have his folks . . . wrangling with him about it." The matter of the insurance was also discussed by the young couple. It will be recalled that the policy was then in appellant's possession. In this situation, George suggested to his wife that as soon as they got "the folks" paid up, he would transfer the policy to her. Respondent knew that the outstanding debt amounted to five hundred eighty dollars.

From the time of their marriage in December, 1928, until the latter part of 1939, respondent worked almost continuously, and the record discloses that during that time her earnings were the mainstay of the couple. George worked when he could, being by trade an automobile body and fender repair man, but his affliction became progressively worse and he could not engage in steady or full-time employment. Owing to his ill-health, he and respondent moved from San Francisco to Montana, then to Arizona, and finally, in 1930, back to Seattle, where George was put on a rest cure for six

months. In Arizona respondent successfully operated an apartment house. On their return to Seattle, she worked, successively, in a waffle shop and two department stores until October, 1932. George worked to some extent during that time, but by the summer of 1932 his arthritis had become so aggravated that he could not use his hands. He then went to Soap Lake for treatment and his condition improved somewhat, but he was still very discouraged, thinking that he would never get well. In that mental condition, he suggested to his wife that they separate, but she refused. Although he was unable to work, she was willing to do all that she could for him through her own personal efforts.

By this time, the amount of George's indebtedness to his parents had been reduced to seventy dollars through payments derived from community funds, most of which, however, had been earned by respondent. Recognizing the situation as it then existed, and considering the debt to his parents substantially paid, George concluded to transfer the policy to his wife, as he had previously stated he would do. He made known his decision to respondent, in October, 1932, by saying to her:

"*We* have the folks all paid up now but $70.00, . . . I will give you that policy and we will stop on our way down town and get it transferred." (Italics ours.)

With that thought in mind, the couple drove to the office of the insurance company on October 28, 1932, just before leaving for Soap Lake. While respondent remained in the car outside, George went into the office with the policy. On his return to the car, he said to her:

"Punkin [a nickname which he often used in talking to her] I have this policy in your name now, it is yours under the name of Susan Sundstrom . . . It is yours now."

The company sent the policy to its home office where a notation was endorsed thereon changing the beneficiary from appellant, the mother, to respondent, the wife. It was then mailed to the insured at his parents' home, that being his forwarding address during his stay at Soap Lake. On his return from Soap Lake, George procured the policy from his parents and delivered it to respondent, saying: "Well, this is yours now." Respondent placed the policy, together with their marriage certificate and some other papers, in a black bag in which they kept their books of account, their legal papers, and certain articles of jewelry.

From this time on until 1940, a period of over seven years, the policy remained unchanged in form and, so far as the record shows, was never the subject of further discussion between George and the respondent. During that period, respondent continued to work as before, but George's condition became worse, although at times he was able to do some work. For about eighteen months after their return from Soap Lake, respondent worked in a hamburger shop. While employed there she won fifty dollars on a punchboard, and with this money she opened a restaurant in Kent which she operated successfully for three years.

In the meantime George's condition had become so serious that he could hardly walk. Respondent decided to take him to eastern Washington where the climate would be drier, so she sold the restaurant for five hundred dollars. With this money she purchased some clothes for herself and her husband, paid appellant ten dollars for their meals during ten days spent in her home, and bought a trailer for two hundred dollars and a Ford car on the installment plan. Arriving in eastern Washington, respondent worked for a while as an apple drier and afterwards as a cook, making enough money to support the couple and keep up the

payments on the car. She then obtained a loan on the car and trailer and purchased a restaurant in Chelan, which she operated successfully until the latter part of 1939. George was able to do but very little work around the restaurant during that entire period.

In August, 1939, while driving to Buckley, Washington, to visit her grandmother, by whom she had been reared, respondent was seriously injured in an automobile collision. Her leg was broken in twelve places, she was injured internally, and her face was severely crushed. She was taken to a hospital where she remained for about twelve weeks, with her leg in a weighted extension. During the first four weeks of her confinement, George seemed kind and attentive to her, came to see her when he could, and attended to the payment of her hospital bill out of the restaurant bank account. From then on, however, his attitude toward her changed. He began complaining about the "awful expense," and ceased further payment on the hospital bill. He also complained to her that she would never be able to be a wife to him again.

In November, 1939, George took respondent from the hospital to their home in Chelan where she remained until December 21st. He then removed her to Buckley to visit her grandmother during the Christmas holidays. Respondent carried with her on that trip the black bag containing the insurance policy and the other articles previously mentioned. George remained with her until after Christmas and then went to Seattle to spend New Year's day with his parents. On January 5, 1940, he returned to Buckley and requested respondent to accompany him to his parents' home. This she declined to do, because she "didn't want to go down there and accept their attentions at

$15 a week" when her aunt and grandmother were willing to take care of her for nothing. Her refusal to leave led to a quarrel with George, as a result of which he angrily left the house without saying goodbye to respondent and returned to Seattle.

Needing money for medicine a few days later, respondent drew a small check on the bank at Chelan. The check was returned by the bank with the statement that George had closed the account on January 4th. On the day the account was closed the couple had one hundred twenty-five dollars in a savings account and about three hundred dollars more in a checking account. Respondent thereupon went to Tacoma to consult a lawyer about getting her money back and was advised by him to institute an action for divorce. This she did on January 13th. As already stated, summons and complaint were served on George on January 23rd, and two days later he made his mother the beneficiary under his policy of insurance by having her name substituted in place of that of respondent. He had evidently taken the black bag in which the policy and the other items already mentioned were kept, on January 5th, the day of his last visit to Buckley. At any rate, appellant admitted upon the trial that she had the bag in her possession. Respondent did not discover that her husband had changed the policy by substituting appellant as beneficiary until shortly before the institution of this action by appellant. The trial court based its findings of fact upon the evidence as thus summarized.

We are convinced that this evidence, if believed by the trial court, fully warranted it in finding that the insured had made an equitable assignment of the policy to respondent in 1932. It is apparent that he was at that time a hopeless cripple. For four years, his wife had faithfully worked to help support him,

and had given him every attention possible. More than that, her earnings had been the principal means by which his personal, premarital debt to his parents had been reduced from five hundred eighty dollars to seventy dollars. Presumably he not only felt a deep affection for her, but also was sincerely grateful for all that she had done. In addition, he had agreed to transfer the policy to her as soon as *they* got "the folks" paid up. The language employed by him when he delivered the policy to her indicated that it was his intention then and there to invest her with full ownership of the proceeds thereof.

It is true that no formal written assignment of the policy was executed, as required by the provision of the policy hereinabove quoted. But that provision, as we have seen, is designed solely for the protection of the insurance company, and its rights are in no way involved here. Although the transaction between the insured and the respondent with reference to the transfer of the policy was simple and informal, it was only natural for a husband and wife to deal with each other in that way at a time when the relationship between them was one of affection and when there was no occasion for either of them to suspect the other of possible future double-dealing. Nor would it be expected that a wife, even if she were aware of the express requirements of the policy and were familiar with legal phraseology, would insist, under the circumstances then existing, that the terms of the transaction be reduced to writing. The evidence amply justifies the conclusion that it was the insured's intention on October 28, 1932, to transfer to respondent a present interest in the ultimate proceeds of the policy, that he delivered the policy to respondent for that purpose, and that by the form of expression which he

then used he made an absolute appropriation of such proceeds to her, relinquishing further control or power of revocation with reference thereto. That being the case, the trial court had sufficient grounds for holding that the insured effected an equitable assignment of the insurance policy to the respondent. The fact that the insured thereafter wrongfully and secretly regained possession of· the policy and was thereby enabled to procure a change of beneficiary cannot be held to operate to divest respondent of the rights theretofore vested in her by the equitable assignment.

While the evidence concerning the material facts came largely from the lips of the respondent, a reading of the flat record itself convinces us of the clarity, cogency, and convincing quality of her testimony. The trial court gave the matter painstaking consideration, repeatedly participated in the examination of respondent, and was obviously convinced that she was telling the truth. A searching cross-examination failed to discredit her.

█ In reaching our present conclusion, we have not been unmindful of the rule that an equitable assignment must be supported by a valuable consideration. *Bleitz v. Bryant Lbr. Co.,* 113 Wash. 455, 194 Pac. 550; 4 Am. Jur. 296, Assignments, § 83; 5 C. J. 931, Assignments, § 90; 6 C. J. S. 1121, Assignments, § 69. There was, in this instance, not only a good consideration, found in the relationship of the parties, in the natural love and affection between them, and in the insured's motives of natural duty and prudence, but there was also a *valuable* consideration, found in respondent's faithful performance of her part of the understanding and agreement that the personal debt of the insured should be paid out of community earnings, which were actually produced largely through her efforts.

The agreement was valid and was fully performed. The insured could not thereafter repudiate it, as he apparently attempted to do, by secretly purloining the policy from respondent and obtaining the endorsement thereon of a change of beneficiary. The proceeds of the policy, as and when payable, became the property of respondent by virtue of the equitable assignment, and the insured had no power or right to divert them from her. His attempted change of beneficiary was ineffectual as to the respondent, and consequently appellant cannot be permitted to profit by it.

The decree is affirmed.

ROBINSON, C. J., MILLARD, BLAKE, SIMPSON, and JEFFERS, JJ., concur.

DRIVER, J. (dissenting)—The life insurance policy in controversy, having been acquired by George Sundstrom before his marriage, was, and continued to be, his separate property. By the terms of the policy, he had the right to change the beneficiary at will; and, therefore, his wife, the respondent, merely by virtue of having been named as beneficiary, in the absence of an assignment, acquired no vested interest, but only a mere expectancy, revocable, without her consent, at the pleasure of the insured. *Cade v. Head Camp, Pacific Jurisdiction W. O. W.*, 27 Wash. 218, 67 Pac. 603; *Koch v. Aetna Life Ins. Co.*, 165 Wash. 329, 5 P. (2d) 313; *Seattle Ass'n of Credit Men v. Bank of California*, 177 Wash. 130, 30 P. (2d) 972; *Massachusetts Mut. Life Ins. Co. v. Bank of California*, 187 Wash. 565, 60 P. (2d) 675. Was there, then, an equitable assignment of the policy?

In *Nickerson v. Hollet*, 149 Wash. 646, 272 Pac. 53, the contention was that there had been an equitable assignment of a certain claim or account, and Judge Tolman, the author of the opinion, said:

"The law as to what constitutes an equitable assignment is not in doubt, and is well stated as follows:

" 'In order to work an equitable assignment there must be an absolute appropriation by the assignor of the debt or fund sought to be assigned to the use of the assignee. The intention of the assignor must be to transfer a present interest in the debt or fund or subject matter; if this is done the transaction is an assignment; otherwise not.' 5 C. J. 909.

" 'The assignor of a chose in action must part with the power of control over the thing assigned; if he retains control it is fatal to the claim of the assignee.' 5 C. J. 912."

This language was quoted with approval in two later cases: *Sneesby v. Livington,* 182 Wash. 229, 232, 46 P. (2d) 733; *Philip v. Seattle,* 195 Wash. 386, 391, 81 P. (2d) 279.

The facts as stated in the majority opinion consist, for the most part, of a narration of respondent's own testimony. There is little corroboration of any of her testimony in the record, and, as to her conversations with the insured, on which her claim to an equitable assignment necessarily must rest, there is none at all.

The question whether or not, under Rem. Rev. Stat., § 1211 [P. C. § 7722], respondent was competent to testify as to transactions had with, and statements · made by, her deceased husband, the insured, was not before this court; but, nevertheless, it seems to me that, in weighing and construing her testimony, to arrive at the intention of the insured, due allowance should be made for her interest and for the fact that there was no one living who could dispute her at the trial. I am heartily in accord with the principle, to which the following cases subscribe, that, where the only person who could directly dispute a witness is dead, the testimony of that witness should be closely scrutinized and weighed in the light of the attendant circumstances, and its reasonable probability carefully

considered. *Holmes v. Connable,* 111 Iowa 298, 82 N. W. 780; *In re Bremer's Estate,* 151 Iowa 449, 131 N. W. 667; *In re Tjark's Estate,* 55 S. D. 636, 227 N. W. 84.

With the foregoing considerations in mind, I have carefully read the entire record, and it is my conclusion that the evidence does not preponderate in favor of the trial court's finding that the policy had been equitably assigned.

Regarding the executory agreement, or declaration of trust, of the insured, on which the finding must be based, the respondent testified:

"Q. Now, Mrs. Sundstrom, at the time you and George Sundstrom were married, did you have any discussion with him regarding this life insurance policy? A. Yes, we did. At the time we were married, he told me he owed them $580.00 for board, and that he owed them for a couple of years, up until the time of our marriage in fact, and he told me that when *he* got his folks paid up he would put that policy in my name, give it to me." (Italics mine.)

George Sundstrom named the appellant, his mother, as his beneficiary and placed the policy in her possession long before he became indebted to his parents for board. The policy was never pledged to secure the indebtedness, and it was not necessary for him to pay it in order to regain possession. As a matter of fact, he did regain possession of the policy from the appellant when a substantial portion of the debt remained unpaid. Manifestly, the insured did not consummate an equitable assignment of the policy to the respondent at the time of his marriage, nor do I think that his statements made at that time, followed by the payment from community earnings of a portion of his indebtedness to his parents and the delivery of the policy to respondent in 1932, were sufficient to constitute an executed contract to assign.

The insured owed other debts at the time of his mar-

riage, and, with the acquiescence of the respondent, he paid them with earnings of the community and without any agreement or expectation that she would get anything in return. His expressions to the effect that, when his parents had been repaid, he would transfer to respondent, or put in her name, or give her the policy, considered in the light of the attendant circumstances, would seem to me to amount to no more than a declaration that he intended to do precisely what he did do in October, 1932; namely, substitute his wife for his mother as the designated beneficiary in his policy.

I, therefore, dissent.

BEALS, J., concurs with DRIVER, J.

[1]Reported in 129 P. (2d) 790.