289 P.2d 692

ESTATE of Matti WAINOLA, also known as M. Wainola, Deceased.

Edessar Geraldin HUDGINS, a minor, and Edessar Barboza, guardian of Edessar Geraldin Hudgins, a minor, Appellants,

v.

Anna Tattari RISTOLAINEN, Uuno Tattari and Eero Tattari, and W. D. Riley, as Administrator of the Estate of Matti Wainola, also known as N. Wainola, deceased, Appellees.

No. 6013.

Supreme Court of Arizona.

Nov. 15, 1955.

Brandt & Baker, Yuma, for appellants.

A. J. Eddy, Yuma, for appellees Anna Tattari Ristolainen, Uuno Tattari and Eero Tattari.

Glenn Copple, Yuma, for appellee W. D. Riley.

WINDES, Justice.

Matti Wainola, a resident of Yuma, Arizona, departed this life on September 23, 1951, and W. D. Riley was appointed administrator of his estate. One Eero Tattari, representing himself to be one of the decedent's heirs, filed a petition alleging that various persons claimed to be heirs and praying that the court ascertain and declare the rights of all persons claiming an interest in the estate. After the usual orders and notice required in such proceedings, Anna Ristolainen, Uuno Tattari and the said Eero Tattari, appellees herein, filed a complaint alleging decedent left neither wife nor surviving children and claiming to be the sister and nephews of decedent and therefore his heirs. Edessar Geraldin Hudgins, a minor, by her guardian Edessar Barboza, as defendant, filed an answer denying plaintiffs as heirs were entitled to share in the estate and claiming that the defendant minor was the child of Wainola and therefore entitled to the whole of the estate. The issue tried was whether decedent was the father of the child. The court adjudged he was not and awarded the estate to the sister and nephews. Defendant appeals. The administrator appears in this court as an appellee, adopts the brief of the other appellees and requests that the lower court's decision be sustained.

There was certain evidence which during the course of the trial the court believed to be inadmissible but permitted defendant to submit in the form of an offer of proof. This was done by taking and reporting the evidence in full. At the termination of defendant's case, her counsel again urged that the excluded evidence be admitted, suggesting that the matter be submitted on written memorandum. The court stated, "if you want to produce some authorities * * * my ruling stands subject to being reversed if you can persuade me I am in error." Authorities were submitted and argued at the conclusion of which the court stated, "I will examine the authorities you have cited and advise you by mail." Upon further reflection the court reversed its ruling and admitted the evidence covered by the offer of proof.

The first complaint of defendant is that the court had no jurisdiction nor right

to reverse its ruling after the evidence was submitted and admit and consider the evidence offered. We fail to perceive merit in this contention. There is no possibility that defendant could be prejudiced by the precise manner in which it occurred. The defendant was benefited to the extent of having the court consider the evidence in arriving at its conclusion. Nothing of value could result by the court taking the time to permit a re-examination of witnesses upon the same subject matter. The procedure was had with the full consent of defendant. Counsel was advised that the court had excluded the evidence but reserved the right, upon examination of authorities submitted, to reserve its ruling and admit the evidence. Had defendant thought this method of handling the matter would be to her disadvantage, she should have objected rather than consented to such procedure. If there existed any basis for valid objection, it certainly was waived.

It is claimed that, assuming the court had the power to admit the evidence, the included testimony was such as to prevent the judgment rendered. This proposition makes necessary an analysis of all of the evidence.

Edessar Barboza, mother and guardian of the minor defendant, testified in substance that she first came to Yuma and became acquainted with decedent in 1930; that she remained in Yuma until October, 1932, when he took her back to Los Angeles in his car; and that during this period of time she saw him practically every day. In October, 1935, she went through a marriage ceremony in Yuma with one Earl Hudgins. She then lived in Los Angeles with Hudgins until November, 1941, when she returned to Yuma. During this period decedent came to Los Angeles to see her every two or three months. Upon her return to Yuma, she remained there until she went back to Los Angeles in July, 1942. She testified that from January 1, 1942 until the following July when she went to Los Angeles, she had intercourse with decedent two or three times a week and that thereafter decedent visited her in Los Angeles each month until the baby was born on February 20, 1943. When the child was born, she gave the sanitarium the name of Hudgins, her purported husband, as the father of the child. The copy of the birth certificate recites that the full name of the father is Earl Hudson Hudgins. The mother's explanation of this was that decedent told her to so represent the name of the father. The mother further testified to the effect that decedent admitted to her he was the father and furnished money at rather regular intervals and treated the child with great affection giving her money and toys. She likewise testified that she took a picture of decedent in the casket at his funeral so that the child could "see and know her daddy".

The record shows that the purported marriage of the mother to Hudgins was annulled in April, 1947, and that she remarried him in November, 1951. She testified that

although living with him, she never lived with him as husband and wife. In fact, she stated that, although she had been married three or four times, "I haven't got a husband". The record further shows that decedent received his citizenship papers in November, 1944, whereby he became a citizen of the United States. As we interpret the mother's testimony, she and Wainola planned to get married when he received his citizenship papers. She continued, however, to live with Hudgins until 1947 and remarried him in 1951.

Viola Poindexter, an older daughter of Edessar Barboza, testified that from the time the mother returned to Yuma in the fall of 1941 until June, 1942, she (the witness) lived with her mother and that about every weekend and a night or two during the week, her mother stayed at Wainola's. The court was compelled to strike several voluntary statements of this witness to the effect that her sister was Wainola's child. The witness seemed anxious to help establish the fatherhood of decedent. This witness further testified that during pregnancy Wainola made visits to Los Angeles each month or two to see how her mother was getting along and also that he came to see her the day after the baby was born. She testified that Wainola was very fond of the little girl and on occasion he brought her toys and clothes. She testified that it was the general reputation in the family that the defendant was the child of Wainola and that her mother had told her she was going to have Wainola's baby.

Mary Dantznac, another daughter of Edessar Barboza, who lived in Los Angeles, testified that during the period of pregnancy, decedent came to Los Angeles about once a month and was there the day after the birth staying several hours with the mother and baby.

Burr Holt, a witness for defendant, testified that he had lived in the Wainola courts since about May, 1941, and that during that time he had seen Edessar Barboza there on at least two occasions. He also testified that he had never seen anyone go into Wainola's living quarters although he had visitors in an outer room which Wainola used as an office.

Calvin Albright, husband of the mother's niece, testified that during the time of her visit to Yuma in 1941, he saw Earl Hudgins, husband of Barboza, once in November, 1941, at the time of the funeral of his wife's mother, and that he did not see him after that time. He testified that during the period from 1945 to 1951 he saw Barboza and Wainola together; that he (Albright) took Barboza to Wainola's several times in the evening and left her there; that Wainola would bring her home in the morning; and that this happened about a half dozen times during the period.

Lola May Albright, Barboza's niece, testified that she saw Earl Hudgins in Yuma at the time of her mother's funeral in November, 1941, and that he did not come back to Yuma until July, 1942. She testified that in 1941, her aunt would stay at

Wainola's overnight; that she saw her at Wainola's on several occasions in his bedroom; and that she was wearing a bathrobe. The witness also testified that Barboza, before her return to Los Angeles in July, 1942, told her that she was pregnant.

Henry C. Murdock and Opal Murdock, his wife, who lived in decedent's court from 1945 to 1950 testified. The wife stated that she saw Barboza in the yard one time and the husband stated that he saw the child in the yard. Both related having heard the mother referred to as Wainola's girl friend.

Art Wilburn, one of defendant's witnesses, stated that during all the time involved herein until Wainola's death, he lived in the room next to that of decedent with only a wallboard partition between and that he could hear from one room to the other. He further testified he never knew Barboza to stay overnight and that had she been there, "they'd have to be awful still or I'd have noticed it". He only remembered seeing the child there one time. He further testified that when decedent left Yuma, he always advised him and he hardly ever left except in the summer.

Appellants say that the foregoing testimony is such that the court was required to find as a fact that decedent was the father of the child and that the court must have rendered judgment for the plaintiffs on a misapprehension of law. We are unable to agree that the court was compelled to find as a fact that decedent was the father of the minor. The rule as heretofore announced by us is that the court need not believe the testimony of interested witnesses. Lentz v. Landers, 21 Ariz. 117, 185 P. 821; Davis v. Industrial Commission, 46 Ariz. 169, 49 P.2d 394. Nor is the court bound to accept as true the testimony of disinterested witnesses unless in the whole case there are no circumstances or matters which cast suspicion upon or impair its accuracy. Otero v. Soto, 34 Ariz. 87, 267 P. 947; Martin v. Industrial Commission, 75 Ariz. 403, 257 P.2d 596.

In the instant case we have a mother who lived with a man by the name of Hudgins from 1935 to 1947 under a purported marriage. A child was born in 1943. The mother gave the name of the purported husband as the father, and it is so recorded on the birth certificate. She remarried the man whose name she gave as the father upon the excuse that "about fifty people came to my door" and threatened to take the child. She further insisted that though she was married to Hudgins and lived under the same roof, she wasn't living with him as husband and wife. She made the statement that she had been married three or four times but didn't have a husband. The mother testified that she spent many nights with the decedent in his room and other relatives and members of her family relate circumstances tending to corroborate her. She and relatives and members of her family testified that both

before and after the birth of the child, decedent visited the mother in Los Angeles every month or so. On the other hand, another witness for defendant who lived all during this time in a room adjacent to decedent's and separated merely with wallboard knew nothing about these weekly visits and testified that during the winter months, decedent seldom went to Los Angeles.

■ Certainly, the whole of the evidence casts considerable shadow upon the testimony of the mother and her relative witnesses. We interpret the mother's testimony to the effect that she and decedent planned to marry when he received his citizenship papers. Although he received these papers seven years before his death, no public claim was ever made that he was the father until eleven years after the birth of the child and death had rendered denial of the charges impossible. Under such conditions, the testimony of witnesses who attack a deceased person should be carefully scrutinized. In re Tjarks' Estate, 55 S.D. 636, 227 N.W. 84; Holmes v. Connable, 111 Iowa 298, 82 N.W. 780.

■ The court had the right to discredit the mother's testimony not only because of the circumstances heretofore related, but also because there exists a strong motive for her to attempt to recover the estate for her child. Naturally the mother was the only one who testified to the acts which resulted in her pregnancy. The other witnesses could only testify to suspicious circumstances that might, if believed, render probable the existence of the essential fact. There is not sufficient testimony from disinterested witnesses which the court must accept as true which would compel the court to believe the mother's story of the source of her pregnancy.

Under all these circumstances, there exist sufficient improbabilities and suspicions to prevent the trial court from being condemned for acting arbitrarily in not believing that the decedent was the father of the minor defendant.

■ Defendant also complains that the court erred in rejecting defendant's exhibits "T", "D–1" and "Y" for the reason that they fall within the exception to the hearsay rule relating to pedigree. The record discloses that Exhibit "T" was admitted. Exhibit "D–1" is an escrow statement from Security First National Bank of Los Angeles dated May 1, 1943, to Edessar Hudgins and was rejected on the grounds of incompetency and irrelevancy. This exhibit has no evidentiary value whatever as to any issue in the instant case. Exhibit "Y" is a collection of empty envelopes addressed to the mother from Wainola, some Christmas cards and other greeting cards signed "M.W.", a telegram signed "MW" welcoming Barboza to Yuma, and several brief notes, some signed "M.W." and some unsigned, advising when the writer was going to Los Angeles or dealing with the addressee's

coming to Yuma. While these papers are an indication that Wainola was acquainted with and corresponded with the mother, there is much evidence, both oral and documentary, in the record to the same effect. Rejection of the Exhibit is not reversible error.

Judgment affirmed.

LA PRADE, C. J., and UDALL, PHELPS and STRUCKMEYER, JJ., concur.